**UNITED STATES of America**

v.

**Abraham MINKER, also known as Abe Minker, John A. Witkowski, also known as John A. Wittig.**

**Crim. No. 20368.**

United States District Court
E. D. Pennsylvania.

March 3, 1961.

Walter E. Alessandroni, U. S. Atty., Daniel J. DiGiacomo, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Jacob Kossman, Robert M. Taylor, Abraham J. Brem Levy, Philadelphia, Pa., for defendant Abraham Minker.

CLARY, District Judge.

This memorandum opinion supplements the Order of this Court entered on February 28, 1961, dismissing defendant Abraham Minker's motion for the suppression of evidence and dismissal of indictment, together with his amended motion for the suppression and return of property of evidence and dismissal of the indictment.

The amended motion, which is merely an amplification of the original motion, sets forth that on October 3, 1959 a search of premises 1955 Hampden Boulevard, Reading, Pennsylvania, second floor, occupied by defendant, Abraham Minker, and his wife, was conducted by virtue of a duly authorized search warrant issued on the preceding day by the United States Commissioner in Philadelphia, Pennsylvania, and that although extensive and intensive search of the premises was made the gambling paraphernalia alleged in the search warrant to be present was not found. Further, that thereafter and without a search warrant or subpoena, without defendant's knowledge, permission, or consent, Internal Revenue Agents entered upon defendant's premises and curtilage thereof, and procured and obtained, illegally and unlawfully, evidence used in obtaining the indictment returned in this case on May 26, 1960, and which evidence the Government plans to use against him in the trial of this case fixed for March 6, 1961. A hearing thereon was ordered by the Court for Monday, February 27, 1961, at 11 a. m.

At the hearing the following facts were established and without contradiction. Minker and his wife leased the second floor apartment of premises 1955 Hampden Boulevard, in the City of Reading, Pennsylvania. The building, known as 1955 and 1957 Hampden Boulevard, each with a separate entrance, front and back, contains four apartment units; two in each unit on the first and second floors of the respective addresses. The lease provides that Minker (and other tenants) shall keep the premises clean and shall place all trash in a receptacle provided by the Management on the premises. Pursuant to housekeeping arrangements, the Management furnished each apartment with a garbage pail which was placed on the rear steps of the apartments and it was the duty of the tenants to place the garbage pail on the curb of the street on the days on which the City of Reading collected garbage. For trash, the Management provided a 55-gallon covered drum enclosed with latticework within the grounds of 1955 and 1957 Hampden Boulevard, immediately adjacent to a stairway consisting of three steps leading from the sidewalk of the side street to the level of the sidewalk in the rear of 1955 and 1957 Hampden Boulevard. This receptacle was used for trash by the four tenants in 1955 and 1957 Hampden Boulevard as well as by Superintendent Noll, whose office was in another building of the project but nearest in point of distance for the disposal of trash to the above-mentioned trash barrel. It was the duty of the Management to dispose of the trash.

A few weeks after the search of October 3, 1959, William Francis Lynn, Jr., a Special Agent of the Internal Revenue Service, accompanied by Patrick Christian Gentile, Internal Revenue Agent, called upon Isaac Noll, the Superintendent, and obtained from him the data regarding Minker's leasing of the property. At that time it was determined that one Anthony Damore, a private trash collector of the City of Reading, residing at 428 Crestmont Street in that city, had been engaged by Noll to dispose of the trash for all buildings of the project. The arrangement, then not known, to the Agents, but testified to by Noll at the hearing, was that since it was his responsibility to have the trash removed, he engaged and paid Damore to come to the premises three times a week and remove the accumulated trash from all receptacles provided by the Management.

It was a matter of complete unimportance to him how Damore disposed of the trash. He stated that once Damore took it, it was his property, and that he did not even know whether he took it to a dump or where the dump was located. Once the trash left the premises Noll's obligation was complete. Damore testified that ordinarily he comingled it with trash collected from other buildings on the project; took it to an outlying dump and merely threw it with other refuse on the dump.

After the interview with Noll, the two Internal Revenue Agents contacted Damore at his home and explained that they were making an investigation of Minker in connection with alleged gambling activities. They requested Damore to segregate the trash taken out of the barrel at 1955 and 1957 Hampden Boulevard and to turn it over to them for such use as might be warranted. The arrangement contemplated that this trash would be picked up either at Damore's warehouse in the City of Reading, or at some place on the streets of Reading, during the collection days of trash from the apartments, which were Tuesday, Thursday and Saturday. Damore testified that he thought it was his duty as a patriotic American citizen to comply with their request and did so.

The evidence clearly shows that at no time did the Internal Revenue Agents enter upon the premises, nor did any of the so-called evidence ever come into their hands at or near the premises involved. The testimony indicates that Damore faithfully segregated the trash from the particular barrel and turned it over to the Agents for the period from November, 1959, up until February 1st of 1961. The dates, which were furnished to the defendant at the hearing, of trash collections involved in the present indictment extended from approximately November 18, 1959 to March 20, 1960.

The Agents testified that the tapes, records, slips and other data secured by them indicated the operation of a numbers bank, a gambling casino, a pinball operation, and other matters indicating illegal gambling activities.

Defendant strongly contends that this activity of the Agents was completely illegal and falls within the proscription of Work v. United States, 1957, 100 U.S. App.D.C. 237, 243 F.2d 660. Just as strongly the Government contends that the ruling in Abel v. United States, 1960, 362 U.S. 217, at pages 240 and 241, 80 S.Ct. 683, 4 L.Ed.2d 668, controls.

It appears to the Court that this case is more nearly analogous to the Abel case and that the doctrine of bona vacantia applies here.

An analysis of the evidence permits of no other conclusion than that defendant Minker abandoned the property involved by placing it in the trash barrel. Superintendent Noll made his contract with Damore, and Damore lawfully removed the rubbish. It was his to do with what he pleased. He could keep it and sell it as waste paper; he could burn it, if he so desired, or he could do as he ordinarily did—place it on the dump. He could also lawfully do what he actually did do, turn it over to the Internal Revenue Agents.

Defendant argues that actually Minker never relinquished control and that he had a right to assume that the property would be destroyed and not fall into the hands of the Revenue Agents; that the Agents by making the arrangement with Damore in some mysterious way made him an agent of the government so that his actions were those of a United States Agent rather than of a patriotic law-abiding American citizen, who was willing to cooperate with the government in the suppression of crime. This argument, of course, must be rejected in its totality. Minker abandoned the property. It was lawfully removed by Damore. Damore had every right, if not an absolute duty, to turn over to the Internal Revenue Agents documents evidencing the commission of a crime over which documents he exercised complete dominion. No constitutional rights of the defendant were invaded. The motion, therefore, was denied.