UNITED STATES of America

v.

Abraham MINKER, also known as
Abe Minker.

Cr. No. 20368.

United States District Court
E. D. Pennsylvania.

Aug. 10, 1961.

See also 191 F.Supp. 683.

Walter E. Alessandroni, U. S. Atty.,
Daniel J. Di Giacomo, Asst. U. S. Atty.,
Philadelphia, Pa., for United States.

Stanford Shmukler, Philadelphia, Pa.,
for Abraham Minker.

KRAFT, District Judge.

Defendant moves for a judgment of
acquittal or for a new trial following a
jury's finding of guilty on five counts of
an indictment charging willful attempt
to evade and defeat wagering excise tax-
es owing by him, in violation of Sec. 7201,

Internal Revenue Code of 1954, 26 U.S.C. § 7201.[1]

The undisputed evidence established a closely organized and large-scale operation of the numbers game in and about Reading, Pennsylvania, during the latter part of 1959 and early months of 1960, the period covered by the indictment. That activity is a criminal offense under Pennsylvania law. The evidence also established in intricate detail that the participants in this enterprise had, through a variety of carefully planned stratagems, made every effort to conceal its operations.

On October 3, 1959, following an intensive investigation, Government agents raided premises in Reading and found a large numbers bank in operation. The officers seized over $4,000 in cash, together with adding machines, numbers slips, summary sheets containing code markings, and other gambling paraphernalia. Defendant Minker was not on the premises. On the same day, pursuant to a search warrant, officers made an exhaustive search of Minker's apartment in Reading. They found nothing which pertained to gambling.

The evidence established that Minker resided in a rented apartment which was one of four dwelling units in an apartment building on Hampden Boulevard, Reading. The tenants of all four apartments deposited their trash in a container located at the rear of the building. One Anthony Damore removed the trash from the premises three times a week, pursuant to a private contract with the superintendent of the apartment house.

On November 16, 1959, the agents requested Damore to turn over to them the trash collected from these premises. Damore readily agreed, and faithfully delivered the trash to the agents from November 18, 1959 to March 29, 1960. Minker's trash was easily identified since it was generally in a bag or a box which contained letters or other articles bearing Minker's name.

In sorting through Minker's trash, the agents came upon torn bits of adding machine tapes, envelopes and other slips of paper. Many of these fragments contained handwriting as well as adding machine figures. In what must be deemed a masterpiece of patient and persistent effort, the agents painstakingly pieced together these fragments and achieved a well-nigh perfect reconstruction of the originals. These reconstructions were assembled in two sizable volumes and introduced into evidence (G–12A, G–12B).

On March 25, 1960, Government agents raided a farmhouse in Exeter Township, a short distance outside of Reading. They found a large numbers bank in operation, and seized some $4,000 in cash, adding machines, numbers slips and other numbers paraphernalia.

Among the articles seized in the raid was a "numbers banker's summary sheet," which played a vital role in the evidence (G–7D). This was a summary of the bank's daily operations from February 29 to March 24 (1960), both days inclusive. The writers appear thereon by code designations, e.g., "Z", "C", "L", "1", etc., eleven in all. Under each code are figures representing total wagers for the day, total cash and total "hits", if any. The evidence indicated that "cash" represented wagers less writer's commission, generally 35%. The summary sheet also contained a column for expenses, covering such items as pads, rent, phone, etc. The figures appearing on the summary sheet, either separately or in combination, corresponded exactly with the figures on the reconstructed adding machine tapes and other memoranda recovered from Minker's trash, day by day throughout the period covered by the summary sheet. The detailed analysis and comparison of the figures by the

---

[1] "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

Government's experts could leave no doubt in any reasonable mind that the two sets of figures reflected the same series of transactions.

The Government produced a handwriting expert who testified that in his opinion, based on proved or admitted specimens, the handwriting on the re-assembled bits of paper was that of Minker.

The materials obtained from Minker's trash, together with the summary sheet seized in the second raid (G–7D), enabled the Government's accounts to calculate, to a high degree of accuracy, the gross amount of the wagers for each of the five months from November 1959, through March 1960.

Finally, the Government's evidence established that Minker had filed no tax returns for the months in question.

Defendant did not take the stand and submitted no evidence in answer to the Government's case.

Defendant's first contention is that the evidence was insufficient to warrant the conclusion, beyond a reasonable doubt, that defendant was under a duty to pay the tax. Boiled down to its essence, the argument is that the proofs fail to establish a proprietary interest in the lottery, that they were equally consistent with a finding that defendant "was only a means of transmitting information." The question was clearly for the jury, and its verdict was the only reasonable one possible under the evidence. The records pieced together from defendant's trash showed the defendant in possession of complete summaries of the bank's operations, including the totals of the wagers, the cash, the "hits", the net profits,—even the day-to-day expenses. The information was of the kind that would only be supplied to the "banker". When it appears that defendant received this detailed information day after day for a period of over four months, the inference is inescapable that defendant was the proprietor of the enterprise. On these tapes and bits of paper were notations and calculations, in defendant's handwriting, of a nature clearly indicating a financial interest. Any reasonable doubt at this point, is resolved by defendant's disposition of this information. His destruction and discarding of the records is clearly indicative of ownership, and renders specious the argument, unsupported by evidence, that defendant was a mere "bookkeeper", or a "transmitter" of the information.

Equally wanting in merit is defendant's contention that the verdict was against the weight of the evidence and that a new trial should be granted.

Defendant's next contention is that the evidence was insufficient to warrant the conclusion, beyond a reasonable doubt, that defendant had the necessary intent to evade and defeat the tax. He asserts that at most the Government proved only a willful failure to file a return and willful failure to pay the tax, which is insufficient to prove the felony under Sec. 7201 of the Code. Defendant's contention is without merit.

The authority in point, of course, is the landmark decision in Spies v. United States, 1943, 317 U.S. 492 at page 498, 63 S.Ct. 364, at page 368, 87 L.Ed. 418, in which the Supreme Court laid down the distinction between the corresponding felony and misdemeanor provisions in the 1939 Code:

"The difference between the two offenses, it seems to us, is found in the affirmative action implied from the term 'attempt,' as used in the felony subsection * * * We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony.

"Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner'. By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, *destruction of books or records,* concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." (Emphasis supplied.)

The Government proved more than "willful but passive neglect of the statutory duty." The evidence disclosed "affirmative action," "willful *commission*" and "conduct, the likely effect of which would be to mislead or to conceal,"—all demonstrative of an attempt to evade and defeat the tax. There were the studied attempts to conceal the existence and operation of the lottery, the sinuous and furtive comings and goings of the operators, the burning of numbers bets and tapes at the time of the second raid, and Minker's destruction and discarding of records at his apartment. Defendant asserts that the clandestine and surrepetitious operation "was obviously for the purpose of avoiding detection of operations in violation of local gambling laws." It is a fair inference that it was for the purpose of avoiding detection of any illegal conduct, for there is no suggestion that Minker discriminated in his

efforts to escape the flagellation of the law. At any rate, this evidence, taken in connection with defendant's repeated and persistent failure to file a return and pay the tax, afforded ample basis for the jury's finding. As stated in Spies, supra, 317 U.S. at page 500, 63 S.Ct. at page 368, "such inferences are for the jury."

■ Defendant's complaint that the Government failed to prove a genuine standard of defendant's handwriting is utterly without foundation.

The Act of Congress provides (28 U.S. C. § 1731):

"The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person."

The Government produced W. E. Hartman, a public accountant, who testified that he had done work for defendant for some years; that he had seen defendant write "a dozen or more times"; that he was able to form an opinion with respect to whether particular handwriting was that of defendant. The Government introduced into evidence a page from defendant's checkbook containing handwritten figures, some pencilled and others in ink (G–1A). Hartman testified that in his opinion the pencilled notations were in defendant's handwriting; that as to those in ink, he could not express an opinion. With respect to the handwriting on five cancelled checks purportedly drawn by Minker, the witness testified, "It appears to be his handwriting" (G–2). Finally, there was admitted into evidence a signature card, with the stipulation that if the President of the bank were called as a witness, he would testify that the signature on the card was that of the defendant, signed by him in the officer's presence (G–3).

In the face of this testimony, particularly in view of counsel's own stipulation, the argument that there was wanting "a genuine standard" of defendant's handwriting borders on the frivolous.

The exhibits afforded a substantial basis for purposes of comparison, and their admission into evidence was eminently proper. Their weight was for the jury. United States v. Angelo, 3 Cir., 1946, 153 F.2d 247, 251.

Defendant further complains that the indictment fails to charge a felony under 26 U.S.C. § 7201, and it was error to permit the jury to find defendant guilty of a felony. There is no merit in this contention.

The Spies case, as already noted, carefully distinguished the felony and the misdemeanor provisions of the 1939 Code (Sections 145(a), 145(b)), and the distinction is equally pertinent under the present Code. It has been seen that the gist of attempted evasion is "affirmative action implied from the term 'attempt' as used in the felony subsections." 317 U.S. 492, 498, 63 S.Ct. 364, 368. The essence of the misdemeanors, on the other hand, is *inaction*. Willfullness, of course, is a necessary ingredient of both offenses. The difference is summed up in a single sentence in Spies, 317 U.S. 492, 499, 63 S.Ct. 364, 368: "We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors."

█ The present indictment was drawn with this distinction in mind. It charges in material part that defendant "did willfully and knowingly attempt to evade and defeat the said excise tax * * * by failing to make such excise tax return * * * by failing to pay * * * the said excise tax * * * and by concealing and attempting to conceal from all proper officers of the United States of America the true and correct amount of wagers * * *." Defendant argues that no active steps of concealment were alleged in the indictment. We think affirmative action is implied from the term "conceal" itself. Even if it isn't, the requirement of affirmative action is supplied by the phrase "attempting to conceal." We are of the firm conviction that the indictment fully satisfies the requirements of the law.

Defendant's next contention is that the Court erred in failing to charge, as requested, that defendant could be found guilty "of the lesser included offenses."

Rule 31(c) of the Federal Rules of Criminal Procedure, 18 U.S.C., provides: "The defendant may be found guilty of an offense necessarily included in the offense charged * * *." Defendant contends that we erred in failing to submit to the jury as lesser included offenses the misdemeanors of *willful* failure to make a return and *willful* failure to pay the tax. Had this indictment charged that the means of attempted evasion were *willful* failure to make a return and *willful* failure to pay the tax, we would have charged as requested on lesser included offenses. However, to determine whether a lesser offense is necessarily included in the offense charged, resort must first be had to the statute and, thereafter, if need be, to the indictment.

█ The test to be employed in determining whether a violation of 26 U.S. C. § 7203 is a lesser offense necessarily included in a violation of 26 U.S.C. § 7201, is whether it is possible to commit the greater offense without having first committed the lesser. James v. United States, 9 Cir., 1956, 238 F.2d 681, 683, 16 Alaska 513. The offense created by § 7201 is not one which, by its very definition, necessarily includes a lesser offense or offenses in the sense that at common law, murder, for example, includes manslaughter, and robbery involves both assault and larceny.

Rather, the crime denounced by § 7201, from its inherent nature, is imprecise in scope and indefinite in content, and is perhaps incapable of exact definition. The statute forbids an attempt to evade "in any manner." The possible manners by which evasion may be attempted are legion, and are coexistensive with human capacity for management, trickery and deceit. Since the lesser § 7203 misdemeanors are not necessarily included in the § 7201 felony, we must next examine

the indictment to ascertain whether in its allegation of the means employed in the attempted evasion, the § 7203 offenses are charged. We find that, except for the significant omission of "willful", they are; but that omission is fatal, for without it no § 7203 misdemeanor is included. Neither failure to file a return nor failure to pay the tax is a misdemeanor unless such failure is willful.

■ By the omission from the indictment of charges of willful failures to file and to pay, the Government undertook to prove a willful attempt to evade, or, failing that, to suffer the defendant's acquittal. It was entitled to no conviction of a lesser offense, nor was the defendant entitled to the requested charge on the indictment so drawn. To the contrary, had we charged on this indictment as the defendant requested and had he been found guilty of a § 7203 misdemeanor thereunder, we would then be met with his contention that the verdict would support no judgment and sentence because the indictment, charging no *willful* failure to file or to pay, alleged no crime defined by 26 U.S.C. § 7203.

Defendant next complains that the charge to the jury contained fundamental errors necessitating a new trial.

■ In the course of a necessarily lengthy charge, we instructed the jury as follows:

> "If, on the other hand, you are persuaded of the existence of the lottery during this period, that Minker conducted it, and while so conducting it, that he willfully and knowingly attempted to evade and defeat any excise tax due and owing the Government of the United States, and that the amount was either what the Government contends, or, if not, was a substantial amount, *then you would find him guilty.*"

Counsel argues that the italicized clause is "the equivalent of a direction to find the defendant guilty." It is nothing of the kind. It is, in effect, a direction to the jury that *if* they were persuaded of the existence of all the elements of the offense charged, they would find defendant guilty. The jury would do precisely that, if they performed their sworn duty. Counsel failed to object to this part of the charge although afforded ample opportunity to do so, and, in the absence of fundamental error, his objection comes too late. F.R.Cr.Proc. 30.

■ Error is predicated on the submission to the jury of the question whether defendant's attempts at concealment were for the purpose of evading "local gambling laws," or with the intent of evading or defeating the excise tax. It is urged that there was no evidence to permit a jury finding "that evasion of the excise tax was a motive behind the method of operation, and that any conclusion to that effect would be pure speculation." There was, of course, no *direct* evidence on the element of motivation. Motivation, like any other intellectual abstraction, is seldom susceptible of direct proof. It is impalpable, imponderable, and exists only in idea and abstract contemplation, and any conclusion in relation thereto must be reached circumstantially. Defendant knew, or must be presumed to have known, of the existence of an excise tax on wagers—indeed, one of the Government officers explicitly apprised him of the fact—just as he knew that the "numbers game" was violative of state law. Nevertheless, he sedulously avoided compliance with the Federal law, just as he consistently scorned and derided observance of the local law. It is reasonably inferable, therefore, that his studied attempts at concealment were with the purpose of evading and defeating the excise tax, as well as avoiding detection of State law violations. We need not speculate as to the relative weight of these considerations,—much depends upon the "local climate". The evidence afforded a reasonable and substantial basis for inference, and it is not to be assumed that the jury was altogether unfamiliar with the complexities and ambiguities of human motivation. The question, therefore, was properly submitted to the jury.

■ Defendant and John Wittig, with others, were indicted in counts 1 and 2 for attempted evasion of wagering taxes for the months of September and October 1959. At the close of all the evidence, we granted defendant's and Wittig's motions for judgments of acquittal on these counts. D.C., 191 F. Supp. 683. Defendant contends that it was a "fundamental requirement" that the Court direct the jury to disregard all the evidence admitted in support of these two charges. Counsel made no motion to that end, and failed to object to the charge on that ground. We do not believe that defendant was prejudiced in the slightest degree by this omission, if such it was, and the objection therefore comes too late.

We have carefully considered defendant's remaining complaints concerning the charge. Counsel failed to make timely objection in respect of any of them, and we find them so wanting in merit as not to require discussion.

Defendant's final contention is that it was a violation of his constitutional rights to admit into evidence the records obtained from the trash container. This issue was decided, adversely to defendant's contention, in proceedings on his motion to suppress. Judge Clary's opinion and order of March 3, 1961, established the law of the case, from which we have no disposition to depart. Defendant asserts that the trial on the indictment developed facts not presented to Judge Clary, and that we should therefore re-examine the question. Our review indicates that defendant errs in his premises. Every fact and circumstance material to the issue was given careful consideration on the defendant's motion to suppress.

### Order

Now, August 10, 1961, it is ordered that the motion of defendant, Abraham Minker, for judgment of acquittal or, alternatively, for a new trial be and it is denied.

It is further ordered that the defendant appear before me for sentence at 10:00 A.M. on September 18, 1961.