STATE of Missouri, Plaintiff-Respondent,

v.

Tommy Sam GAYE, Defendant-Appellant.

No. 36418.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Nov. 25, 1975.

Motion for Rehearing or Transfer
Denied Jan. 23, 1976.

Application to Transfer Denied
March 8, 1976.

Latney Barnes, Mexico, James E. Cafer, Vandalia, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Paul Robert Otto, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

NORWIN D. HOUSER, Special Judge.

Tommy Sam Gaye appeals from a conviction and sentence by a jury to 50 years' confinement on a charge of armed robbery by means of a dangerous and deadly weapon.

Appellant's main contention is that he was not afforded his Sixth Amendment right to counsel; that he did not waive his right to counsel; that he was totally incapable of representing himself and the court erred in compelling him to do so, and that no evidentiary hearing was conducted to determine his capacity to represent himself.

The State introduced evidence that on August 28, 1973, appellant held up Cruzan's Liquor Store in Mexico at gunpoint, robbed the operator of $942, fled in the automobile of a female accomplice named Mae Louise Bruner; that the automobile was stopped by police and both were apprehended a few minutes after the robbery; that the $942 was found hidden in the underclothes of the accomplice.

Arraigned in magistrate court on August 31 and advised of his rights, appellant requested and was granted a continuance to September 14 to enable him to obtain and consult with counsel. Bond was fixed at $15,000. On September 14 appellant appeared in magistrate court with Attorney Granville Collins. At appellant's request a preliminary examination was set for October 5, on which date appellant appeared with Attorney Collins. At the conclusion of the preliminary examination the magistrate found probable cause and bound appellant over for trial in circuit court. An information was filed on October 10. On November 6 appellant was brought before the circuit court, without counsel. Attorney Collins had been employed to represent appellant only at the preliminary hearing. The circuit judge informed appellant that the punishment for the crime charged, if found guilty by a jury or on a plea of guilty, was imprisonment of not less than five years "on up to life imprisonment." Appellant wanted time to consult with an attorney and asked for a reduction of bail so he could "get out and hire a lawyer." The court conducted an informal inquiry into appellant's past record and ability to make bond, reduced the bond to $7,500, and offered to appoint counsel to represent appellant. At appellant's request the court delayed appointment of counsel for a month to give appellant a chance to make bond and to

employ a lawyer. On November 23 the court, at appellant's request, set the case over to December 3 to give appellant a further opportunity to make bond and employ counsel. The judge informed appellant at that time that if he failed to make these arrangements by that time the court would appoint counsel. Appellant failed to employ counsel, so on December 3 the court appointed Attorney G. Andy Runge to represent appellant. On the same day, after consulting with counsel, appellant was arraigned, plead not guilty, and the cause was set for trial January 17, 1974. On January 11 on motion Mr. Runge was permitted to withdraw as appellant's counsel. On the same day Attorney Melvin D. Benitz, employed by appellant's aunt, entered his appearance as attorney of record for appellant. The cause was continued to February 4 for a March trial setting, and was eventually reset for trial March 28. By letter postmarked March 23 appellant informed Mr. Benitz that he did no care to "go any farther" with him and that Mr. Benitz need not come to the March 28 hearing. Upon receipt of the letter Mr. Benitz telephoned Circuit Judge George Adams, informed him that he had received the letter of discharge and requested leave to withdraw as counsel. Judge Adams refused to permit Mr. Benitz to withdraw, stating that since the case was set for trial it would be tried; that if appellant did not want Mr. Benitz to represent him appellant would try his own case. Judge Adams asked Mr. Benitz to sit at the table so that if appellant wanted the advice of an experienced attorney it would be available to him.

Prior to trial on the morning of March 28 Judge Adams conferred with appellant, Mr. Benitz and the prosecuting attorney. Judge Adams reviewed the history of the case in circuit court; informed appellant that he was going to have to try his case "some day"; recited that the case had been set twice, and postponed since the previous November at appellant's request. Appellant remarked that the bond was too high, and that he would like to hire his own lawyer. The judge told appellant he was going to try the case himself "this morning," and asked appellant if he thought he would be better off trying it himself without a lawyer. Appellant responded, "Like I don't have no other opportunity, you know. Like this is a must, you know. I must go to court but I'm not going to try my own case." The court warned appellant: "Well, you're going to sit there and the jury's going to hear the evidence and they're going to probably convict you if you don't attempt to do something. Do you think I'm going to let you just sit around and never be tried?" Appellant complained about the size of the bond. The judge responded that he had cut the bond from $15,000 to $7,500; that it is a serious charge which can carry life imprisonment; that the bond has to be substantial. Asked why he had waited until five days before trial to discharge his attorney appellant indicated that he came to the conclusion after talking to Mr. Benitz in January, at which time he was informed that the prosecutor would recommend 12 years upon a plea of guilty; that he was "not good for no robbery" and was not going "to no penitentiary." Conceding that he could not make $7,500 bond, and being informed that the judge was not going to reduce it further, and asked by the judge, "How are we ever going to try your case?," appellant said, "O, well, then, we might as well go on this morning and get the trial on * * * because I ain't going to keep going around in no circles, you know." The judge agreed that they had been going around in circles; stated that he had given appellant every opportunity to procure counsel; reminded appellant that he had appointed a "good lawyer" for appellant and that his folks had hired a "good lawyer" for him, and concluded, "There's just no use granting you a continuance if the next time you come up for trial you're going to do the same thing. You don't have a lawyer and you don't want to go to trial." He reminded appellant that he had had four months, and asked, "What if you don't go to trial today? Are you ever going to go to

trial?" Appellant answered, "Well, I'm ready to go to trial today." The judge asked if he had any witnesses he wanted subpoenaed. Appellant said no. Asked if he wanted to act as his own lawyer appellant answered, "I don't want to be my—I'll go in there." The judge informed appellant that if he went into court and started talking when he was not supposed to the judge would put him back in jail and try him in his absence; that appellant was not going to "make a monkey out of everybody else" because he wanted to talk; and pointed out that the prosecuting attorney was skilled and knew what he was doing, but that appellant was going to be "at a tremendous disadvantage" in asking questions because he was not a lawyer. Appellant repeated willingness to try the case that day since the judge was not going to lower his bond. The judge said, "I just feel like that I should go on and proceed with the trial because its obvious here we'll never try it." Appellant said he was aware that he could dismiss Mr. Benitz or any other lawyer at any time; that he had the "say-so" whether he should have him or not; that he did not see why the court should force Mr. Benitz upon him; that he had dismissed Mr. Benitz. The court observed, "And every time your case is set you dismiss the next lawyer so you'll never be tried for robbery." The prosecuting attorney suggested asking Mr. Benitz to sit at the counsel table, to be available if appellant wanted to talk to an attorney during the trial, so he would not have to rely upon the prosecuting attorney or judge as to what the legal consequences of certain matters might be. The court had told Mr. Benitz by telephone that he would not permit him to withdraw nor permit appellant to "fire him to the extent that he wouldn't be in the courtroom," available to consult with appellant and answer any questions appellant might ask. Appellant objected to Mr. Benitz sitting next to him at the counsel table but "did not mind" Mr. Benitz remaining in the courtroom. The judge suggested Mr. Benitz remain inside the bar at the bench, in case appellant wanted to turn to him. The judge then advised appellant for the second time that he would be at a tremendous disadvantage; that he could try his own case if he wanted to but he did not know how; did not know what questions to ask to bring out matters in his own favor, or what questions to object to. The prosecuting attorney then advised appellant in detail what evidence the State intended to introduce, including the fact that Mrs. Bruner had turned State's evidence and would implicate him as the robber. Appellant commented, "O man, o man." The prosecutor stated appellant's guilt was clear; that the punishment should be severe and that he would ask the jury for a 50-year sentence, to punish appellant and deter others like-minded. Mr. Benitz asked if he was to be in the courtroom "under judicial compulsion." The judge answered in the affirmative; that he was not permitting him to withdraw; that Mr. Benitz' client had indicated he did not want him at the table; that the judge did not share the wisdom of appellant's action "but that's something I cannot make him do"; that the trial would proceed; that appellant had ample time to prepare his case for trial, and had the services of an appointed attorney and a hired attorney; that if a continuance was granted there would be no assurance that appellant "will ever be ready for trial"; that not only was appellant entitled to a speedy trial but the State "has some rights and the State's entitled to a speedy trial before witnesses are lost and the time has elapsed where adequate justice cannot be accomplished or done for both sides." The court cautioned appellant against outbursts in the courtroom, and advised appellant that he would have to decide whether the State makes a case for the jury, whether he wanted to take the stand or not; that if he took the stand appellant's previous conviction could be shown in evidence. The judge asked appellant what he wanted to do—"[d]o you want to continue the case and try—and reset it at a later date or what?" Appellant said, "No, go on and try it this morning. * * * I can't ever make no

bond so therefore as you say, it would just gradually keep going and keep going; so might as well get it over this morning."

Before the jury was empanelled the judge cautioned the prosecuting attorney that since the defendant "is not represented that you should be very, very careful in your opening statement, and of course throughout the entire procedure, to limit your statements and your questions to matters clearly relevant and competent because he does not have * * * an attorney who would recognize irrelevant or incompetent questions; so be very, very careful to be sure that you lean over backwards if necessary in avoiding controversial statements or questions. Okay?" Among other questions asked the panel on voir dire, the prosecuting attorney asked whether anybody would be prejudiced for or against the defendant, either way, because of his race; whether anybody would be prejudiced against defendant for acting as his own lawyer "as he has the privilege of doing," and whether anybody would attach special significance to the testimony of policemen or law enforcement officers, and be prejudiced in favor of them, just because they were officers. The panel was quizzed as to their own personal experiences with robbery, burglary and theft. Three of them recited such experiences. All indicated that these considerations would not affect their deliberations. Out of the hearing of the jury and at the end of the State's examination on voir dire the court asked appellant three times whether he wanted to ask any questions to find out whether they would be impartial, to which appellant three times answered "No." The judge explained that three jurors had had experience with burglaries; that generally such people do not "feel too kindly" toward someone charged; that if appellant desired the court would strike their names off the list. Appellant said to leave them on. The judge explained to appellant that after the State made its challenges the list would be returned to him and he would have the chance to discuss challenges with Mr. Benitz. When the list

was returned the judge told appellant he had the right to strike eight names off the list, any eight, and that if he did not strike off eight the top twelve would try his case. Appellant said "Yeah, well, them's the ones. I mean I'm not going to sign nothing. I'll just take the twelve." The judge repeated his explanation of appellant's right to strike, and asked whether appellant would like to talk to Mr. Benitz about whether he should strike off any of them. Appellant said, "No, sir." The judge then suggested leaving appellant by himself to think it over, and asked if he wanted a little time to do so. Appellant said, "No, sir. I don't want to strike none off." The judge made sure appellant understood that if he did not strike any the jury would be composed of the first twelve. He named the twelve to appellant one by one. He suggested that Mr. Benitz sit at a place on the bench within 3 feet of the chair, so he would be "immediately accessible" to appellant. The judge explained to appellant that the jury would be put in the box and the prosecuting attorney would make a statement of what he thought the evidence would be; that appellant should not shake his head in agreement or disagreement; that when the prosecutor finished appellant, if he wanted to, could get up before the jury and tell them what evidence he was going to offer; that although appellant had the right to testify he did not have to testify; that at the end of the State's case, if the State "made enough case to go to the jury" he would have a recess and talk to appellant about his rights and what could happen if he testified,—"do the best I can to explain that to you." The record is punctuated with affirmative answers on the part of appellant, indicating he understood the judge's explanations. At the conclusion of the State's opening statement, out of the hearing of the jury, the judge informed appellant that he had the right to make an opening statement but did not have to; that he could wait until the end of the State's evidence; that in an opening statement he could tell the jury what evidence

he intended to offer. The judge again warned appellant that he did not have to testify; that he could make his statement now or wait. Appellant indicated that he wanted to make his statement at that time. Appellant told the jury that he just got out of the penitentiary March 8; that the night he was picked up (August 28) he came from Illinois; that he had some money; that he was a dope fiend; that he was sleepy-like, nodding, more like in a daze; that he and Mrs. Bruner were in the car with the policeman behind, so they pulled off the road and he stuck the money in her pants because he had just gotten out of "the joint"; that he tried to explain at the police station where he got the money but they refused to listen and accused him of robbery; that Mrs. Bruner "automatically tried to free herself" by placing the blame on him; that she refused to tell the truth and was making a false statement implicating him in the robbery; that he robbed nothing; that he merely gambled and played people for money as a con man; that he would not have a pistol on him "for nothing" and people who knew him were aware that he did not use a pistol "whatsoever"; that he had been trying to get a "good-enough lawyer" because he was not qualified to speak in his own behalf, because he was an ex-convict, with no rights whatsoever in a courtroom; that here he was facing robbery, with no witnesses, nothing but himself, and that all his rights had been denied from the start. After the first witness was examined on direct the court, out of the hearing of the jury, explained what cross-examination is and that after each witness testified for the State appellant would be offered an opportunity to ask questions to try to bring out testimony favorable to appellant. Appellant declined to cross-examine the first witness. After each subsequent witness' testimony for the State was concluded the court offered, and appellant declined, the opportunity to cross-examine. When they adjourned for the noon recess, following the direct examination of Mrs. Bruner, the judge suggested to appellant that he think about what she had testified to and write down matters he might want to cover. When the court reconvened the judge asked appellant if he had thought about it and whether he wanted to ask Mrs. Bruner any questions. Appellant had thought about it but he declined to question her. Appellant declined to object to any of the exhibits offered in evidence, although given an opportunity to do so. At the conclusion of the State's case the judge, outside the hearing of the jury, spent five pages of the transcript explaining to appellant his right to testify and the State's right to cross-examine him and bring out prior convictions. The judge reminded appellant that Mr. Benitz was there, available to be asked questions about what he thought appellant should do. The judge asked whether appellant had any questions; advised appellant that if he had any witnesses he was entitled to call them; that if he did not testify the judge would go over the instructions to the jury with Mr. Benitz and the prosecuting attorney present, and urged appellant to "think and be sure [he] made a good sound judgment" on whether he wanted to take the stand and testify. The judge said that he would not attempt to advise him whether to take the stand or not; that his discussion was not to try to "sell" appellant on the idea of taking or not taking the stand. Indicating that he understood, appellant declined to take the stand or present any evidence. At the conference on instructions the judge explained to appellant that not having taken the stand he was entitled to an instruction that he had a right not to testify and that no inference of guilt or other inference could be drawn from the fact that he did not testify. He told appellant how to argue that point to the jury if this instruction was given. He also pointed out the drawback to giving the instruction: that it might emphasize the fact that he did not take the stand. Appellant stated that he was aware of what the judge was saying but he did not want to offer an instruction of that nature. When the instructions were ready the judge asked if he objected to all

of the instructions, and appellant said "Yes." The judge then spent some time explaining the procedure and appellant's rights with respect to arguments. At the suggestion of the judge appellant and Mr. Benitz were left alone in the room to give appellant an opportunity to discuss the matter of argument. Appellant wanted to talk to Mr. Benitz a few minutes and ask a few questions. Following their conference, in which appellant did not indicate that he desired Mr. Benitz to participate in the arguments, the prosecuting attorney made his argument. Appellant then made a closing argument. He argued that he had not been properly identified; that the money had not been properly identified by serial numbers; that the money was his and he had earned it; that Mrs. Bruner, offered a small sentence, testified against him to save herself. He pointed out that the liquor store operator did not properly identify him by facial characteristics, etc.; that he was not guilty of the robbery and that no "trace" led to him; that the money was found on Mrs. Bruner; that the car was Mrs. Bruner's; that there were no fingerprints on the pistol, the money or on the counter; and implied that he was the victim of a situation in which a black man was found in the getaway car and was pointed out by all as the robber when in fact he was innocent of the robbery.

While the jury was out Mr. Benitz informed the court, in answer to questions, that appellant had conferred with him in the courtroom about five times during the trial, but the things about which he talked did not concern the trial or matters of procedure. When the jury returned its verdict the judge on his own initiative polled the jury, received the verdict, and *sua sponte* granted appellant an additional 30 days to file a motion for new trial, pointing out the advantages of having counsel and the absolute necessity of having an attorney to file a motion for new trial and take an appeal.

■ Under federal standards, controlling in this determination, *Morris v. State*, 456 S.W.2d 289, 292[1] (Mo.1970), appellant's

Sixth Amendment right to counsel was not violated by the trial court, and no error was committed in allowing and requiring appellant to go to trial under the circumstances, for he is held to have waived the right to counsel.

Initially the court appointed counsel to represent appellant (Mr. Runge). Apparently appellant was not satisfied, for shortly thereafter a second lawyer (Mr. Benitz) entered his appearance for appellant. He was employed by appellant's aunt, and court-appointed counsel was allowed to withdraw (all with appellant's concurrence). Appellant caused several months' delay in bringing the case to trial by assertions that he could get out on a reduced bond and hire a lawyer he had in mind. Appellant waited until just a few days before the second setting of the case for trial to attempt discharge of his employed counsel, and on March 28 was still bent on getting out on bond; still talking about employing a third lawyer—one of his own choice (which he had not accomplished in seven months and which was unlikely, since he was penniless). In now claiming his Sixth Amendment right to counsel appellant is not asserting an original right to counsel. He is asserting a right to a third choice, as was the case in *Cleveland v. United States*, 116 U.S.App. D.C. 188, 322 F.2d 401, 402–403 (1963), cert. den. 375 U.S. 884, 84 S.Ct. 157, 11 L.Ed.2d 114, wherein the court made this apropos statement: "The problem here is not right to counsel or the right to counsel of the defendant's choice. It is whether another continuance was required to allow the defendant to exercise the right to a third choice. We think that, under the circumstances of this case, the assignment judge could reasonably have concluded that it was not."

■ A waiver of the right to counsel must be an "intelligent and competent waiver." *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938). It is preferred practice for the trial court to conduct an inquiry sufficient for an appellate court to determine whether

the defendant "knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). In this connection see *United States ex rel. Torry v. Rockefeller*, 361 F.Supp. 422 (W.D.N.Y.1973), and cases cited l. c. 426[10]. Appellant appeared before the circuit judge on November 6, November 23, December 3 and March 28. The proceedings on those four occasions occupy 67 pages of transcript. While these proceedings were not specifically designated for the purpose of making that determination, the exchange between court, appellant and counsel gave the trial court and this court an opportunity to determine appellant's intellectual capacity to understand and appreciate his position, situation and problems, the difficulties confronting him and his need for counsel in the trial of the case. At these four sessions appellant was questioned and examined. Statements were elicited from him. He was advised of the minimum and maximum penalties for conviction of armed robbery. Appellant, a 22-year-old black with a seventh grade education, previously employed as a dishwasher and car washer, although uneducated and unlettered, demonstrated that he is intelligent. His answers were responsive to questions asked. He knew what he wanted and was able to articulate his thoughts, albeit ungrammatically. The transcript demonstrates that appellant "was well aware of his right to (and need for) counsel and of the advantage of representation by counsel." (Our parentheses.) *United States v. Rosenthal*, 470 F.2d 837, 845 (2d Cir. 1972), cert. den. 412 U.S. 909, 93 S.Ct. 2298, 36 L.Ed.2d 975. He was advised against self-representation and warned of the risks, pitfalls, possibilities, and serious consequences of conviction, as suggested in *United States v. Duty*, 447 F.2d 449, 451 (2d Cir. 1971), and referred to in *United States v. Calabro*, 467 F.2d 973, 985[19] (2d Cir. 1972), cert. den. 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587. A factual background was provided " 'sufficient to establish to our satisfaction that the defendant' knowingly and willfully waived his right to counsel." *United States v. Rosenthal*, supra, 470 F.2d l. c. 845. Given the choice of going to trial with employed counsel Benitz acting in his behalf, or of trying the case pro se, he would have neither. Protected against himself by court order requiring Mr. Benitz to remain at his side, available to explain and assist, appellant spurned the offered opportunity to profit by the attorney's advice and suggestions. As a result of his stubborn and intransigent attitude appellant was convicted and given a severe sentence, an eventuality predicted by judge and prosecutor if appellant did not avail himself of the assistance of counsel. If appellant may be said to have been denied the benefit of counsel, it is a case of self-denial; if wounded by not having counsel actively defending him, it was a self-inflicted wound.

A circumstance of importance is that on the morning of March 28 appellant failed to give the trial judge any good reason for dissatisfaction with and his desire to discharge Mr. Benitz. He inferred that he reached that conclusion because Mr. Benitz informed him (back in January) that the prosecuting attorney would recommend 12 years if he plead guilty and that he was not guilty, but it was counsel's duty to transmit that information to his client, and he would have been derelict if he had failed to so inform appellant. Appellant did not tell the judge that he had lost confidence in Mr. Benitz, or give any reason for his attitude on the matter of representation.

Under these circumstances appellant's adamant refusal of assistance by his employed counsel, an able member of the bar, constituted a waiver of representation.

There was reason for the trial judge to suspect that appellant's last-minute discharge of his counsel was a delaying tactic. Trial at the January 17 setting had been delayed when appellant changed lawyers from Mr. Runge to Mr. Benitz. At the March 28 setting appellant wished to change lawyers again. The court was reasonably of the opinion that the case would

be postponed indefinitely if appellant's wish for further delay for new counsel should be routinely indulged.

Appellant's motion for new trial alleged that he had been "led to believe that he would receive a lesser sentence if he tried the case against him without counsel rather than with an attorney, although the opposite was true; but because of defendant's ignorance and lack of experience he believed he would be better off without counsel to assist him." Although appellant repudiated this at the hearing of the motion, we have considered this as a possible explanation for appellant's refusal to continue with Mr. Benitz. It would not lie in the mouth of a defendant confronted with a strong case against him to engage in such a maneuver and then complain that he did not have the assistance of counsel at his trial. That was plainly the situation in *Arellanes v. United States*, 353 F.2d 270 (9th Cir. 1965), cert. den. 385 U.S. 870, 87 S.Ct. 139, 17 L.Ed.2d 97, in which both trial and appellate court held "that the appellant knowingly and purposefully maneuvered himself into the situation in which he would be defending himself, without counsel, he thinking that since he had no defense a lawyer could not help him and that his being without counsel might be an advantage to him. He thereby waived any right to complain that he did not have the assistance of counsel at his trial." 353 F.2d l. c. 275[5].

In *United States ex rel. Davis v. McMann*, 386 F.2d 611, 618–619 (1967), cert. den. 390 U.S. 958, 88 S.Ct. 1049, 19 L.Ed.2d 1153, the Second Circuit, recognizing the right of a defendant to proceed without counsel and refuse representation of assigned counsel, made the following statement, which fits this case: " * * * [H]e may not use this right to play a 'cat and mouse' game with the court * * * or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where, in moving along the business of the court, the judge appears to be arbitrarily depriving the defendant of counsel. * * * "

Appellant's situation is closely akin to that of the defendant in *United States ex rel. Testamark v. Vincent*, 496 F.2d 641 (2nd Cir. 1974), in which the court held that defendant's actions at trial constituted a waiver of his right to counsel. The court said, 496 F.2d l. c. 643–644[3]: "He was given the choice between proceeding with appointed counsel, or proceeding *pro se*. He chose to do neither. After each witness testified for the State, Testamark was given the opportunity to cross-examine or have Lipton step back into the case. He spurned these repeated opportunities to represent himself or to be represented by counsel. Thus, on June 22, 1970, Testamark told the court, 'I would like an Appellate Division lawyer.' (referring thereby to counsel assigned from a list available to the Appellate Division). Since he already had counsel, the court denied this request. At the opening of the trial and even on the second day, Testamark renewed his motion for other counsel and informed the court that he had dismissed Lipton. Testamark insisted that Lipton not represent him and that he not sit next to him or even be in court. Lipton nevertheless remained in the courtroom to assist if called upon.

"Testamark's refusal to participate in the trial or confer with counsel were of his own choosing. The court gave him the opportunity to proceed with counsel or to represent himself. Actually the court gave him both because Lipton was available at all times."

Other federal cases supporting our conclusions include: *Kates v. Nelson*, 435 F.2d 1085 (9th Cir. 1970); *United States v. Calabro*, supra; *United States v. Rosenthal*, supra; *United States ex rel. Torry v. Rockefeller*, supra; *Leino v. United States*, 338 F.2d 154 (10th Cir. 1964), and the dissenting opinion in *United States v. McMann*, supra, 386 F.2d 621.

■ Appellant asserts error in failing and refusing to grant appellant a continuance; that he did not know until ten min-

utes before the trial commenced that he would be acting as his own attorney, and this did not give him time to consider the merits of his case, discover the identity and probable testimony of the State's witnesses, prepare opening and closing statements, consider what defense to present, consider whether to call witnesses, etc. The question is whether the exercise by the trial court of his discretion in this connection was reasonable. *United States v. Hall*, 448 F.2d 114 (2d Cir. 1971), cert. den. 405 U.S. 935, 92 S.Ct. 971, 30 L.Ed.2d 810. "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964). In this case there was no motion or request for a continuance. Appellant twice indicated that he wanted to try the case on the day it was set, and announced ready for trial. The point is obviously an afterthought. Even so, appellant has made no showing that he had any defense to present, or any witnesses he could have subpoenaed if granted a continuance. Appellant had seven months to "consider the merits of his case." He was informed at the pretrial conference as to the probable testimony of the State's witnesses. The trial date had been set approximately six weeks in advance, after the court had granted appellant several previous postponements. There has been no showing of prejudice from the failure of the court sua sponte to continue the case, and no abuse of discretion is manifest. *United States v. Rosenthal*, supra, 470 F.2d l. c. 844[13, 14]. In *United States v. Llanes*, 374 F.2d 712, 717 (2d Cir. 1967), cert. den. 388 U.S. 917, 87 S.Ct. 2132, 18 L.Ed.2d 1358 the panel said: "We and other courts of appeals have repeatedly made clear that the right to counsel 'cannot be  *  *  *  manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice.' [citing numerous cases]. Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay."

■ Appellant claims that Judge Adams should have disqualified himself because he was not impartial but was hostile towards appellant. Our extended recital of the conduct of the trial judge is sufficient to dispel this charge, and to show that instead of manifesting hostility he leaned over backwards (as he admonished the prosecuting attorney to do) to see to it that appellant had a fair trial. Throughout the proceedings, from beginning to end, the judge carefully and patiently explained to appellant the procedural situation and the choices to be made, as they developed; advised him as to various possibilities; offered the opportunity to cross-examine each witness, and led him by the hand through the course of the proceeding. On his own motion the judge granted appellant thirty additional days within which to file a motion for new trial, instead of the usual ten days, and urged upon him the absolute necessity of having counsel to prepare for and conduct an appeal. At first appellant stated that he did not want to appeal, and asked the court to sentence him. Thereafter appellant changed his mind and decided to accept appointment of counsel and take an appeal, whereupon the judge set aside the sentence and appointed highly qualified and competent counsel to file a motion for new trial. When that was overruled the judge resentenced appellant, granted an appeal, appointed the same lawyers to conduct the appeal, allowed jail time, and authorized appellant to appeal as a poor person. Appellant has no room for complaint on this score.

■ Appellant claims error in not instructing the jury panel at the first recess in the form specified by MAI–CR No. 1.08(a). Instead the trial judge admonished the jurors not to discuss the case among themselves, or speculate as to what the evidence was going to be, "*  *  *  and you must not permit any person to talk about any fact or circumstance connected with the case in your presence or your

hearing. If someone should do so, tell them you're on the jury panel, and if they were to persist in wanting to talk about the case after you have told them you're on the panel, it is your solemn duty to report that fact to the deputy sheriff or to the Court. * * * " As stated in *State v. Vernor*, 522 S.W.2d 312, 316 (Mo.App.1975), "Absolute and literal compliance with MAI–CR is ordered and expected by the Supreme Court. Any deviation from the printed page now constitutes error, the prejudicial effect of which is to be judicially determined. Rule 20.02(e)." To any reasonable juror the admonishment given by the court adequately covered the substance of the matters required by MAI–CR No. 108(a), and in the absence of any showing of misconduct on the part of the members of the jury panel we find the error harmless in this case. *State v. Vernor*, supra.

■ There is no merit in appellant's point that the trial was unfair and not impartial, and that the judge and jury were partial to the prejudice of appellant. The trial judge's careful consideration for and protection of appellant's rights have been demonstrated. The prosecuting attorney's conduct and approach throughout the trial was highly professional. He demonstrated a proper regard for the rights of the accused and the position in which appellant placed himself. He observed the court's admonition to be careful not to ask improper questions or make controversial statements. At no time did the prosecuting attorney seek to take advantage of appellant. The jury deliberated a reasonable length of time, taking an hour and four minutes to announce that they had reached a verdict.

Appellant asserts error in failing to advise appellant of his right to challenge jurors for cause, or the manner in which to do so. There is no merit in this point. The trial judge gave appellant every opportunity to quiz the members of the panel, but he declined to ask a single question. Nothing was elicited indicating that there was

ground for challenging any juror for cause. Furthermore, a jury trial is not a forum for teaching trial practice, and there was no duty on the judge to lecture appellant on the intricacies of challenge for cause. In *United States v. Redfield*, 197 F.Supp. 559 (D.Nev.1961), aff. 295 F.2d 249, it was held that a defendant who competently and intelligently waived his right to counsel was not entitled to have the court give him a course in the art of trying a lawsuit or coach him every step of the way.

■ Appellant claims the court should have advised appellant of his right to challenge the array on the ground that black jurors are systematically excluded from jury service in Audrain County; that appellant desired to make such a challenge but did not know how to proceed. Appellant did not make this desire known at the trial. The burden is on the defendant to establish discrimination in the selection of jurors. *State v. Aikens*, 507 S.W.2d 386 (Mo.1974). Although belatedly raised in the motion for new trial, appellant made no effort at the hearing of that motion to substantiate these allegations by evidence that systematic exclusion was practiced in the composition of the trial panel. Furthermore, the circuit court cannot be faulted for not anticipating this unstated desire or for not reviewing this branch of criminal law for the edification of appellant.

■ There was no error in not instructing on the lesser offense of stealing without the consent of the owner because there was no evidence from which the jury could infer that the operator of the liquor store was not put in fear of bodily harm. The evidence was that the robber had a nylon stocking over part of his head, and a gun in his hand, which was pointed at the victim's head. The victim testified that he was in a state or condition of mind of being "pretty well shook up" because the gun was pulled on him. No inference other than fear of immediate injury could be drawn from this testimony. "It is contrary to the universal

experience of all mankind to say that a person would experience no fear when confronted with a gun in the hands of a robber." *State v. Ray,* 354 S.W.2d 840, 843 (Mo.1962). And see *State v. Tidwell,* 500 S.W.2d 329 (Mo.App.1973); *State v. Parker,* 324 S.W.2d 717 (Mo.1959); *State v. Underwood,* 470 S.W.2d 485, 486 (Mo.1971), cert. den. 405 U.S. 928, 92 S.Ct. 980, 30 L.Ed.2d 802; *State v. Harris,* 452 S.W.2d 577 (Mo. 1970).

Finally, appellant claims that 50 years' imprisonment is so excessive as to constitute cruel and unusual punishment; that there were no aggravating circumstances, and the usual range of punishment upon these facts is between 10 and 20 years. The Supreme Court ruled that a 99-year term for robbery in the first degree is not excessive because within the limits prescribed by § 560.135, RSMo 1969, in *Garrett v. State,* 486 S.W.2d 272 (Mo.1972), and that 50 years for robbery in the first degree is not excessive because "within the limits prescribed by the statute." *State v. Herron,* 349 S.W.2d 936 (Mo.1961). The Supreme Court of this State has never required or enforced uniformity of sentencing in criminal cases, and we have no power to do so as long as highest court in the State adheres to the rule reannounced in *Garrett* and *Herron,* supra.

Affirmed.

SMITH, C. J., and ALDEN A. STOCKARD, Special Judge, concur.