**STATE of Missouri, Respondent,**

v.

**Ted Fred EHLERS, Appellant.**

**No. 13381.**

Missouri Court of Appeals,
Southern District.

Jan. 29, 1985.

Motion for Rehearing or to Transfer
Denied Feb. 13, 1985.

Application to Transfer Denied
April 2, 1985.

Scott B. Tinsley, William H. Wendt, Springfield, for appellant.

John Ashcroft, Atty. Gen., Dan Crawford, John M. Morris, Asst. Attys. Gen., Jefferson City, for respondent.

FLANIGAN, Judge.

A jury found defendant guilty of assault in the first degree, § 565.050,[1] by means of a deadly weapon, § 565.050.2, and he was sentenced to 18 years' imprisonment. At the trial the defendant, who is not a lawyer, represented himself. Defendant appeals.

---

1. All references to statutes are to RSMo 1978, V.A.M.S., and all references to rules are to Mis-

The offense took place on October 20, 1982, at defendant's home in Springfield. The state's evidence shows that on that date defendant shot Douglas McQueen, the state's principal witness, with a pistol, injuring McQueen's hand. Also present during part of the episode was defendant's wife Jo Ehlers, a defense witness. Defendant did not testify. There were no other witnesses to the assault. The two-day trial commenced on May 23, 1983.

On this appeal defendant asserts that the trial court erred in the following respects; (1) permitting defendant to represent himself, (2) failing to instruct the jury on the issue of self-defense, (3) receiving evidence concerning a shooting incident which occurred on February 20, 1983, involving defendant, (4) receiving evidence concerning an incident which occurred on May 22, 1983, involving a burglary at defendant's residence, a knife attack upon defendant, and the theft of the knife by defendant's unknown assailant, and (5) failing to instruct the jury on the issue of "extreme emotional disturbance." For the reasons which follow, this court finds no merit in any of defendant's contentions and affirms the judgment.

Defendant's first point is that the trial court erred in permitting defendant to represent himself because: (a) the trial court did not adequately inform defendant of the dangers and disadvantages of self-representation, (b) the trial court did not adequately explore defendant's intellectual capacity to make the decision to waive counsel, and (c) the trial court did not inform the defendant that he could not subsequently claim inadequacy of representation. These alleged deficiencies, defendant argues, made his waiver of counsel ineffective because it was not "knowing and intelligent."

The Sixth and Fourteenth Amendments guarantee that a person brought to

souri Rules of Court, V.A.M.R.

trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment. A defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. A state may not constitutionally hale a person into its criminal courts and there force a lawyer upon him when he insists that he wants to conduct his own defense. The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. Although in most criminal prosecutions a defendant could better defend with counsel's guidance than by his own unskilled efforts, the defendant must be free personally to decide whether in his particular case counsel is to his advantage. When a defendant manages his own defense he relinquishes many of the traditional benefits associated with right to counsel. For this reason, in order to represent himself, the defendant must knowingly and intelligently forgo those relinquished benefits. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, supra, 95 S.Ct. at 2541.

■ Missouri, prior to *Faretta*, recognized a criminal defendant's right to represent himself. The right is based on Art. 1, § 18(a) of the Missouri Constitution, and Rule 31.02(a). See *Bibbs v. State*, 542 S.W.2d 549, 550 (Mo.App.1976), and the authorities cited there.

Sec. 600.051 authorizes the trial court to permit the waiver of counsel to be filed in any criminal case wherein a defendant may receive a jail sentence or confinement if the court first determines that defendant has made a knowledgeable and intelligent waiver of his right to assistance of counsel and the waiver is signed before and witnessed by the judge or clerk. The statute lists six items of information which the waiver must contain and which the defendant has read or which have been read to him before he signs. Rule 31.02(a) imposes upon the trial judge a duty to inform the defendant of his rights and to find that the defendant has intelligently waived his right to counsel.

In various settings a waiver of counsel has been held valid, *State v. Thomas*, 637 S.W.2d 81 (Mo.App.1982); *Powell v. State*, 581 S.W.2d 37 (Mo.App.1979); *State v. Quinn*, 565 S.W.2d 665 (Mo.App.1978); *State v. Gaye*, 532 S.W.2d 783 (Mo.App. 1975), or invalid, *State v. Tilley*, 548 S.W.2d 199 (Mo.App.1977). In *State v. Quinn*, supra, an appendix to the opinion suggests topics which the trial judge should discuss with the defendant in determining the adequacy of the waiver of counsel. The state has the burden of producing evidence of a voluntary and understanding waiver. *State v. Tilley*, supra.

■ At his arraignment and preliminary hearing defendant appeared in person and by counsel. Thereafter both sides conducted discovery through counsel. On February 3, 1983, the court sustained a motion by defense counsel to withdraw.

On February 7, 1983, a hearing was held before Judge Max Bacon at which the defendant appeared pro se. The defendant stated to the court, "I am requesting, again, that I be able to represent myself in this case." A signed waiver, in the form prescribed by § 600.051, was obtained from the defendant in accordance with the procedure set forth in the statute.

Defendant informed Judge Bacon that he was financially able to employ counsel but preferred to represent himself. Judge Bacon advised the defendant on the perils of self-representation. The defendant, who

was 47, informed the court that he had been "house attorney for a truck line" for several years, and participated in several trials, as counsel, under Rule 172 of the I.C.C. The defendant said that he had cross-examined witnesses and had been cross-examined himself "for several years." He told Judge Bacon that that experience would help him in representing himself in this case and added, "I just feel that since I was at the scene of the crime that I am more qualified to represent myself than anyone else."

The defendant was informed that there were many things a lawyer might know how to do in his defense which defendant might not know how to do. These things included discovery, preparing the case for trial, finding out what the prosecutor's case is, and finding out what evidence and arguments there are on defendant's behalf. The defendant was told that at the trial itself a lawyer would know how to select the jury, examine and cross-examine witnesses, prepare instructions, and make an opening statement and closing argument. Judge Bacon told the defendant that a person who is not trained in the law has a distinct disadvantage with respect to those things. Defendant stated that he understood but that he still desired to represent himself. Judge Bacon said he would permit the defendant to do so.

On the morning of the trial, and before it commenced, Judge J.A. Appelquist, who conducted the trial, had an extended colloquy with the defendant with regard to self-representation. The defendant informed the court that he had a tenth grade education, that he had no difficulty in understanding English, that he understood that the state would be represented by a licensed attorney, and that he knew that he had a right to an attorney. He informed the court, "I have to represent myself and such is my intention." The written waiver, previously obtained on February 7, was brought to the attention of Judge Appelquist. The prosecutor called the court's attention to *State v. Quinn,* supra, and its appendix.

From the foregoing it is clear that there is no factual foundation for prongs (a) and (b) of defendant's first point. Defendant cites no authority for the proposition that the failure of Judge Bacon and Judge Appelquist to inform defendant expressly that he could not subsequently claim inadequacy of representation makes the waiver invalid. Sec. 600.051 does not specifically require that item of information be imparted but it is set forth in the appendix to *State v. Quinn.* On the instant record this court holds that defendant's waiver of counsel was a knowing and understanding one. *State v. Thomas,* supra; *State v. Tyler,* 622 S.W.2d 379 (Mo.App.1981); *State v. Nicolosi,* 588 S.W.2d 152 (Mo.App. 1979); *State v. Rollie,* 585 S.W.2d 78 (Mo. App.1979); *Powell v. State,* supra; *State v. Gaye,* supra. Defendant's first point has no merit.

■ Defendant's second point is that the trial court erred in failing to instruct on the issue of self-defense because there was evidence, contained in the testimony of Jo Ehlers, that defendant "attempted to terminate the confrontation [with McQueen] and thereafter McQueen went toward his gun when defendant shot him."

Only McQueen and defendant's wife Jo Ehlers testified to the circumstances leading up to and including the assault. Defendant makes no claim that McQueen's testimony entitled defendant to an instruction on self-defense.

McQueen, a Greene County deputy sheriff, became acquainted with defendant around October 1, 1982. At defendant's request McQueen taught defendant how to load and use a pistol which defendant had obtained. The two men went to a target range six or seven times over a two-week period.

On October 19, the day before the shooting, McQueen went to defendant's home to meet defendant. They had planned to ob-

tain some pumpkins to "resell for Halloween." According to McQueen, defendant was "passed out." Jo Ehlers asked McQueen about rumors that defendant was "running around." McQueen testified that he "did not confirm or disconfirm" the rumors because he did not want to get "involved in such conversations."

McQueen testified that defendant telephoned him early in the morning of October 20 and said, "There is no big problem but I need to see you." McQueen drove to defendant's house and arrived at 6:15 a.m. McQueen had his .45 caliber revolver in his right coat pocket because, he said, he was carrying $1,500 with which to buy pumpkins.

McQueen testified that Jo Ehlers met him at the door, let him in and led him down the hall to the recreation room where McQueen sat on a couch. Mrs. Ehlers sat down nearby and was crying. Defendant came in from the kitchen. According to McQueen, defendant had a .38 caliber revolver in his left hand and a .38 automatic in his right hand. The .38 revolver was owned by McQueen and he had previously left it there.

McQueen testified that defendant screamed obscenities and said over and over, "I'm going to kill you." Defendant's face was flushed and his eyes were bloodshot. McQueen thought defendant had been drinking.

McQueen said that defendant ordered him to strip and McQueen undressed "all the way to my socks and underwear." Defendant's son Randy came into the room. Defendant put a tape recorder on the table in front of McQueen and told McQueen to turn it on and hear "why I'm going to kill you." Randy turned it on. "It was Jo's voice explaining to [defendant] that I said he was running around. It seemed like the tape played a long time but I am sure it was just seconds. While the tape was playing defendant was waving both guns and hollering he was going to kill me. Both guns were cocked fully back. After the

tapes played a while defendant went into another rage and extended his right arm out. I felt he was going to shoot me then and I fell to the floor and as I did I heard a gunshot. My .45 was in my right coat pocket of my leather coat. The coat was to my left side."

McQueen also said, "When defendant fired I went to the floor. I was still watching him the best I could. I threw my hand up to protect my head. After I started to look up, defendant leaped the few feet there was between us and fired again at point blank range. I was hit. It went in my hand cracking this knuckle and twisting this finger and came out the palm of my hand.

"There was hardly any time between the first shot and the second shot, almost contemporaneous. As I was shot I headed toward the door and I crawled as fast as I could down the hallway toward the front door.... I succeeded in getting out—still crawling. I got to my truck. Just before I got to the driver's side defendant came out on the front porch and hollered, 'I'm still going to kill you,' and fired several more times. Defendant still had both guns in his hands. I drove to the hospital....

"I know my gun was in my coat to the left. I did not ever see that gun after I was forced to strip. I did not at any time move toward my gun when I was shot. I had a knife in my right pocket but it never left my pants pocket and I did not exhibit the knife to defendant. I never exhibited the .45 revolver to defendant."

Defendant did not testify nor did his son Randy.

Jo Ehlers testified as follows:

"I was not in the room when the shots were fired. Before the shots were fired McQueen was sitting on the sofa and I was sitting in the chair next to the sofa. When I heard the shots, I was in the back bedroom. While McQueen was sitting on that couch, McQueen had a gun on the floor. When McQueen arrived that gun was in

McQueen's right hand coat pocket. That gun ended up on the floor 'when [defendant] told [McQueen] to take ...' "

Defendant then elicited the following testimony from his wife on direct examination:

"Q. (By the defendant) Did you see anything before you left the room?

A. All I saw was the gun laying on the floor.

Q. Where was Mr. McQueen at that time?

A. He was on the couch, and you had told him to get out. When I left the room, you had—before I left the room, you told him to get out. And when I left, Doug was going down to the floor towards the gun. I got up and left."

On cross-examination by the prosecutor, Jo Ehlers testified that she could not swear as to whether defendant had two pistols in his hands. "I know of one." She testified she left the room and did not see anyone shooting at anyone else. "I did not see the shots fired."

Sec. 563.031 provides, in pertinent part:

"1. A person may ... use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself ... from what he reasonably believes to be the use or imminent use of unlawful force by such other person, unless:

(1) The actor was the initial aggressor; except that in such case his use of force is nevertheless justifiable provided

(a) He has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened use of unlawful force; ...

. . .

4. The defendant shall have the burden of injecting the issue of justification under this section."

The issue of justification is not submitted to the jury unless supported by evidence. See § 556.051(1).

It is defendant's position that Jo Ehlers' testimony constituted evidence that defendant, although the initial aggressor, had withdrawn from the encounter and effectively communicated such withdrawal to McQueen but that McQueen persisted in continuing the incident by the use or threatened use of unlawful force, thereby satisfying the requirements of § 563.031(1)(a).

Many Missouri cases discuss the concept that withdrawal by the initial aggressor from the encounter, coupled with effective communication of that fact to the other person, revives the former's entitlement to self-defense. In some cases the evidence was insufficient to entitle the defendant, under the withdrawal doctrine, to a self-defense instruction, *State v. Spencer,* 307 S.W.2d 440 (Mo.1957); *State v. Gadwood,* 342 Mo. 466, 116 S.W.2d 42 (1937); *State v. Dunlap,* 639 S.W.2d 201 (Mo.App.1982). In *State v. Mayberry,* 360 Mo. 35, 226 S.W.2d 725 (1950), the evidence was sufficient. See, generally, 55 A.L.R.3d 1000 (Withdrawal reviving right of self-defense).

If there is substantial evidence putting self-defense in issue, it is the duty of the trial court to instruct on self-defense as part of the law of the case and this is true whether or not the defendant requests the instruction. *State v. Pride,* 567 S.W.2d 426, 430–431[3–4] (Mo.App.1978). See also MAI–CR 2.41.1. The evidence must be reviewed in the light most favorable to defendant's hypothesis of self-defense. *State v. Potter,* 657 S.W.2d 694, 698[3] (Mo.App. 1983).

■ In *State v. Gadwood,* supra, at p. 57, the court said: "As long as a person keeps his gun in his hand prepared to shoot, the other person is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault." That language was quoted with approval in *State v. Spencer,* supra, 307 S.W.2d at 444.

Even under the testimony of Jo Ehlers defendant had at least one gun in his hand.

He had "the drop" on McQueen. This evidence destroys, rather than supports, a finding that defendant had "withdrawn from the encounter and effectively communicated such withdrawal" to McQueen. Indeed, which need not be decided, it may well be that Jo Ehlers' testimony was insufficient to show that McQueen "persisted in continuing the incident by the use or threatened use of *unlawful* force." All she said was that McQueen "was going down to the floor toward the gun." McQueen's intentions, if any, concerning the use of that gun, are left to speculation. Defendant's second point has no merit.

■ Defendant's third point is that the court erred in receiving into evidence testimony of state's witness Howard Rifenberg, a Springfield police officer, concerning an incident which occurred at approximately 2:20 a.m. on February 20, 1983, involving the defendant. There was no objection to the testimony at the time it was presented and defendant's motion for new trial, prepared by counsel, did not mention the alleged error. Accordingly it has not been preserved for appellate review, Rule 29.-11(d). This court, in its discretion, examines the point to determine if the admission of the testimony constituted plain error affecting substantial rights and resulting in manifest injustice or miscarriage of justice. Rule 29.12.

Rifenberg testified that he was dispatched to the Battlefield Inn "in regard to a disturbance and shots being fired." When Rifenberg arrived at the scene defendant was there. Rifenberg quoted the defendant as saying that he had come out there to have a discussion with his son Randy but Randy had pushed him and they had a disturbance. Rifenberg said, "There was no more to it than that."

Rifenberg then testified that he interviewed Randy, who was nearby. He quoted Randy as saying that he had had a fight with defendant "down on the parking lot" and that defendant "had fired a gun up in the air two or three times and nothing more than that." A few minutes later Randy told Rifenberg that defendant had fired a .38 revolver "into the concrete" and that a piece of concrete or fragment of a bullet had struck Randy in the bottom of the foot.

Carol Hassler, who was present at the Rifenberg-Randy conversation, told Rifenberg that she "went down and talked to defendant" and talked him into giving her the .38 revolver. The woman then produced the revolver and gave it to Rifenberg.

The revolver was then admitted into evidence as state's Exhibit 1. It had previously been identified by McQueen as his gun and as one of the guns which defendant held in his hands at the time of the assault on McQueen. The gun was not offered into evidence at the time McQueen identified it.

The state argues that the testimony concerning the February 20 incident "had a legitimate tendency to establish defendant's guilt in that it tended to establish the defendant's identity as the assailant." Identity was not an issue with respect to the assault on McQueen. Indeed in his opening statement made before the introduction of any evidence, defendant told the jury that he had fired a warning shot to "[McQueen's] right and I also fired to his hand as he was reaching for his .45 revolver," but did so in self-defense.

On timely objection the evidence concerning the February 20 incident should have been excluded. This court holds, however, based on a review of the whole record, that the admission of the evidence did not result in manifest injustice or a miscarriage of justice. See *State v. Escoe*, 548 S.W.2d 568, 571 (Mo. banc 1977).

Defendant's fourth point is that the trial court erred in receiving into evidence testimony of state's witness Howard Rifenberg, a Springfield police officer, concerning an incident which occurred on May 22, 1983, which was the day before the trial commenced. This point was not mentioned in

defendant's motion for new trial and it has not been preserved for appellate review. This court examines the point for possible plain error.

Before Rifenberg testified, the state had presented the testimony of McQueen. During his cross-examination of McQueen, defendant offered defendant's Exhibit C, a knife, and it was received into evidence without objection. McQueen identified the exhibit as his knife. He had previously testified that the knife was in his possession, although not shown to defendant, at the time of the October 20, 1982 assault.

Rifenberg testified that at 11:20 p.m. on May 22, 1983, he was dispatched to defendant's home "concerning a stabbing." Defendant interposed an objection on the ground of irrelevancy. The prosecutor informed the court that the only purpose of the testimony was "in connection with following the location and possession of the knife." The court overruled defendant's objection and denied defendant's motion for mistrial.

Rifenberg then testified that he found defendant alone at his home. Defendant told Rifenberg that someone broke through the screen door, grabbed a knife off the table, stabbed the defendant with it, and ran back out of the door. Rifenberg also testified that defendant "said the knife was the knife that he was going to present in court on this trial." Rifenberg said there was a small wound on the right calf of defendant's leg. The witness looked for the knife outdoors but did not find it. He also said that the defendant said that the thief ran across the back yard, that the back yard had very high grass, and that he, Rifenberg, searched for footprints in the yard and found none.

The state's brief argues that the challenged testimony was admissible "as it bore upon defendant's credibility." In essence the state argues that defendant lied

to Rifenberg concerning the knife incident because defendant introduced the knife into evidence the next day. The flaw in the state's argument is that defendant did not testify and his credibility as a witness was never in issue.

The state makes no argument that evidence of the May 22, 1983, incident was admissible on the theory that it constituted an attempt to destroy evidence and showed a consciousness of guilt within such cases as *State v. Lockett,* 639 S.W.2d 132 (Mo. App.1982), and *State v. Dennis,* 622 S.W.2d 404 (Mo.App.1981). Defendant introduced the knife into evidence before the state presented the evidence of the May 22 incident.

On timely objection the evidence concerning the May 22 incident should have been excluded. This court holds, however, based on a review of the whole record, that the admission of the evidence did not result in manifest injustice or a miscarriage of justice. See *State v. Escoe,* supra.

■ Defendant's fifth point is that the trial court erred in failing to instruct the jury on the issue of "extreme emotional disturbance," as the term is used in § 565.-060.1(3)(a), for the reason that the evidence sufficiently injected that issue into the case.

Sec. 565.060.1, on the date of the instant offense,[2] read, in pertinent part:

"A person commits the crime of assault in the second degree if:

.   .   .

(3) He attempts to kill or to cause serious physical injury or causes serious physical injury under circumstances that would constitute assault in the first degree under section 565.050, but

(a) Acts under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse. The rea-

---

**2.** Sec. 565.060.1 was amended in 1983 and the present version does not contain the language pertaining to "extreme emotional disturbance."

sonableness of the explanation or excuse shall be determined from the viewpoint of an ordinary person in the actor's situation under the circumstances as the actor believes them to be; ..."

The statute also provided that the defendant shall have "the burden of injecting the issue of extreme emotional disturbance."

Sec. 556.051 reads:

"When the phrase 'The defendant shall have the burden of injecting the issue' is used in the code, it means

(1) The issue referred to is not submitted to the trier of fact unless supported by evidence; and

(2) If the issue is submitted to the trier of fact any reasonable doubt on the issue requires a finding for the defendant on that issue."

McQueen testified that after he arrived at defendant's home on the morning of the assault, defendant screamed obscenities and said over and over, "I'm going to kill you." McQueen also testified that he tried to ask defendant what the problem was and "that made him madder and madder." McQueen also testified, "after the tapes played a while defendant went into another rage."

If in fact the foregoing testimony was sufficient to submit the issue of extreme emotional disturbance, as the term is employed in § 565.060.1, the trial court was required to submit the issue in the state's verdict-directing instruction, give a separate instruction directing a verdict of not guilty of first degree assault if that issue was found for defendant, and give MAI–CR 19.03 and MAI–CR 19.04.1. The foregoing requirements are found in paragraph 5 of the Notes on Use to MAI–CR 19.02 which applies to assaults committed prior to August 13, 1984. See MAI–CR 2d 19.-02.1–84, Notes on Use, par. 1(A). For the reasons which follow, this court holds that the evidence was insufficient to inject the issue of extreme emotional disturbance.

The Criminal Code, enacted in 1977, with an effective date of January 1, 1978, was a product, to a large extent, of "The Committee to Draft a Modern Criminal Code." In October 1973 that committee presented its official draft of the proposed legislation. The committee's proposed draft of the statute dealing with assault in the second degree contained the language of § 565.060.-1(3)(a) previously quoted. In its comment under that proposal the committee said that the "extreme emotional disturbance" provision "is the same as provided in the homicide offenses." The Proposed Criminal Code for the State of Missouri, October 1973, p. 134. The "extreme emotional disturbance" language was also set forth in the committee's draft of the manslaughter statute. Referring to that language, as applied to homicide situations, the committee said at p. 129 of its report:

"The Code expressly provides for allowing the jury to consider the effect of extreme emotional upset for which there is a reasonable explanation or excuse on the degree of criminal homicide. It allows for reduction in the grade of the crime (but not exculpation) if the jury finds that the situation was such that a reasonable man in the defendant's situation would have been extremely upset and consequently that the killing which the defendant committed was attributable in part to the situation and not entirely to the defendant's evil disposition. In general the man who kills while reasonably upset is not as blameworthy as the man who kills calmly or who is unreasonably upset and kills. This is the same sort of value judgment the jury could make under the common law category of 'heat of passion.'"

The only evidence concerning the reason for defendant's assault upon McQueen was to the effect that defendant's wife told defendant that McQueen had previously told her that defendant was running around. Even if McQueen himself had made that statement directly to defendant, Missouri cases, antedating the criminal

code, held that "language or epithets, however offensive, will not justify or excuse an assault." *State v. Brown*, 165 S.W.2d 420, 422[4] (Mo.1942). See also *State v. Little*, 228 S.W. 793, 798 (Mo.1921).

Cases discussing the "extreme emotional disturbance" language of § 565.060.1 include *State v. Ellis*, 639 S.W.2d 420 (Mo. App.1982) and *State v. Bienkowski*, 624 S.W.2d 107 (Mo.App.1981). In each of those cases the evidence was held insufficient to inject the issue. In *Ellis* the defendant and his accomplice Tunstall assaulted one Binion who had previously attempted to persuade defendant and Tunstall to engage in homosexual acts. Ellis argued that his fear of homosexual rape entitled him to submission of the issue of extreme emotional disturbance. Rejecting that argument, the court said that the attack on Binion was calculated, preparations had been made the day before by secreting the weapons in the area where Binion would be found, and there was no threat of an assault by Binion upon Ellis or Tunstall. The court said, at p. 424: "All the evidence shows that the assault was coolly and deliberately planned and executed, and that neither Ellis nor Tunstall was in anything approaching a state of 'extreme emotional disturbance.' "

In *Bienkowski* defendant was convicted of first degree assault on one Ronald. Ronald had teased some teenagers singing Christmas carols. Previously defendant, who had been drinking, left home with a six-pack of beer and a loaded pistol. After defendant instigated an altercation with Ronald's wife, Ronald pushed and cursed defendant. As Ronald reached for his pocket, defendant feared for his life and shot him. At page 109 the court said:

"The mitigation of *extreme* emotional disturbance is available to the 'ordinary' person caught up in events out of his control. The defendant cannot hide behind reactions he himself set in motion. The 'ordinary' person is not belligerent. This situation was set up by defendant's 'evil disposition,' and there was no reasonable justification for defendant's actions...." (Emphasis in original.)

It will be observed that, in *Bienkowski*, supra, the court said that there was no reasonable justification for defendant's actions, as distinguished from his state of mind.

In the case at bar McQueen had been summoned by defendant to the latter's home. Defendant brandished the guns immediately upon McQueen's arrival. That conduct was the product of prior deliberation. That conduct was not justified by mere words on the part of McQueen, however offensive those words might have been. The assault, as was the situation in *State v. Ellis*, supra, was "coolly and deliberately planned and executed." It cannot properly be said that defendant was "caught up in events out of his control," *State v. Bienkowski*, supra.

Even assuming that defendant's acts were under the influence of extreme emotional disturbance, the statute requires "a reasonable explanation or excuse" for that disturbance. This court holds that the record would not support a finding of a reasonable explanation or excuse for defendant's state of mind and the trial court did not err in failing to instruct the jury on the issue of extreme emotional disturbance. Defendant's fifth point has no merit.

The judgment is affirmed.

TITUS, P.J., concurs.

GREENE, J., dubitante.