**STATE of Missouri, Respondent,**

v.

**William L. STAVRICOS, Appellant.**

**No. 9421.**

Missouri Court of Appeals,
Springfield District.

Feb. 6, 1974.

---

John C. Danforth, Atty. Gen., G. Michael O'Neal, Robert Presson, Asst. Attys. Gen., Jefferson City, for respondent.

W. Newell Toalson, James H. Wesley, II, Springfield, for appellant.

TITUS, Judge.

After alleging a prior felony conviction, the information charged that defendant, on

or about December 4, 1971, "did . . . wilfully, unlawfully and feloniously, possess [Count I] a derivative of opium, to-wit: morphine sulphate,[1] contrary to Sections 195.020 and 195.017, 4, (1)(a) . . . as amended, [and in Count II] a salt of pethidine, to-wit: Pethidine hydrochloride contrary to Sections 195.020 and 195.017, 4, (2)(n) . . . as amended." The jury returned separate verdicts finding defendant guilty on both counts. Defendant's new trial motion was overruled and he was sentenced to two concurrent five year terms of imprisonment. He appeals.

Springfield police were summoned to defendant's residence the afternoon of the aforementioned date to investigate the shooting of Danny Bailey. He was found wounded and lying on defendant's front porch. Defendant told the police that Bailey had shot himself with defendant's gun which defendant had hidden in his "back yard in a bunch of leaves." While officers were inspecting "a bullet hole in the house" across the street from defendant's, and during a conversation with the occupant who "thought [defendant] was the one" that did the shooting, another neighbor advised that defendant had just been seen to enter his house empty-handed and leave by the rear carrying a brown paper sack which he threw over the back fence into a vacant lot before returning to the house and emerging from the front door. The officers went to the vacant lot at the rear of defendant's premises to the place where the sack was purportedly thrown. After a short walk through the weeds in the vacant lot, a brown paper sack was found with a similar sack inside which contained numerous ampoules, bottles, boxes, polyethelene envelopes and plastic bags. In describing the sack in the vacant lot, one officer testified: " . . . it was obvious, it was right out where you could see it. . . . The bag was quite obvious lying by the fence there." Defendant was placed under arrest for investigation of felonious assault and advised "of his rights." Thereafter when defendant "was placed in the paddy wagon" he was also placed under "arrest for possession of narcotics and this was due to the fact that there was . . . what appeared to be narcotics at that time retrieved . . . from just outside the back yard at" defendant's house. Subsequent laboratory analysis showed that the brown paper sacks contained three ampoules of morphine sulfate, described as "an opium derivative," and 17 boxes, bottles, bags and envelopes containing pethidine hydrochloride, said to be "a salt of pethidine" with the common name of "Demerol." Evidence of Bailey's shooting and defendant's arrest for felonious assault was not presented to the jury but was included in the testimony given at the hearing on defendant's motion to suppress.

Save for §§ 195.145, 195.150 and 195.180, the General Assembly in 1971 repealed §§ 195.010 to 195.270, inclusive, RSMo 1969, and in lieu thereof enacted thirty-six new sections. Laws of Mo.1971 [S.C.S. H.C.S. H.B.69], pp. 237–260. Those parts of new Chapter 195 pertinent herein are: Section 195.010. "Definitions.—The following words and phrases as used in this chapter have the following meanings, unless the context otherwise requires: . . . (6) 'Controlled substance' means a drug, substance, or immediate precursor in Schedules I through V listed in this chapter; . . . ." Section 195.016. "Nomenclature.—The controlled substances listed or to be listed in the schedules in this act are included by whatever official, common, usual, chemical, or trade name designated." Section 195.017. "Substances, how placed in schedules—lists of scheduled substances. — . . . 4. The controlled substances listed in this subsection are included in Schedule II. (1) Any of the following substances, except those narcotic drugs listed in other schedules, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by

---

1. "Sulphate" is a variant of "sulfate."

combination of extraction and chemical synthesis: (a) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate. . . . (2) Any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, whenever the existence of these isomers, esters, ethers and salts is possible within the specific chemical designation: . . . (n) Pethidine; . . . ." Section 195.020. "Prohibited acts.—It is unlawful for any person to . . . possess, have under his control, . . . any controlled or counterfeit substance except as authorized in this law, or to possess any apparatus, device or instrument for the unauthorized use of any controlled substance." Section 195.200. "Penalties.—1. Any person violating any provision of this chapter relating to schedules I or II is punishable as follows: (1) For the first offense, other than selling, giving or delivering any controlled substance listed in Schedule I or II, by imprisonment in a state correctional institution for a term of not more than twenty years, or by imprisonment in a county jail for a term of not less than six months nor more than one year, . . . ." Section 195.230.—"List of controlled substances, division of health to prepare, where filed.— The division of health of the department of health and welfare shall prepare a list of all drugs falling within the purview of controlled substances. Upon preparation, a copy of the list shall be filed in the office of the secretary of state."

I

■ The substance of the first point in defendant's brief is that "Counts I and II of the information are defective in failing to charge an offense under Sections 195.020, 195.017, or [4?] (1)(a) and 195.017, 4, (2)(n), R.S.Mo., 1969, amended 1971." Contrary to Rule 84.04(d) V.A.M.R. [Rule 28.18; State v. Warren, 469 S.W.2d 662, 663 (Mo.App.1971)], this point does not advise wherein and why defendant claims the information failed to charge an offense and

is, therefore wholly inadequate to preserve anything for appellate review. State v. Tartenaar, 371 S.W.2d 192, 194 [1] (Mo. 1963). Nevertheless, Rule 28.02 requires us to consider the sufficiency of the information albeit the point was not properly preserved by the brief. State v. White, 431 S.W.2d 182, 186 [4] (Mo.1968).

■ By "a plain, concise and definite written statement of the essential facts constituting the offense charged" (Rule 24.01), the information charged defendant with wilfully, unlawfully and feloniously possessing [§ 195.020] a derivative of opium, to wit: morphine sulphate [Sec. 195.017–4(1)(a)] and a salt of pethidine, to wit: pethidine hydrochloride [Sec. 195.017–4(2)(n)]. Thus, the defendant was informed of the constituent facts necessary to acquaint him with the particular offenses charged. The information followed the language of the stated statutes and is sufficient. State v. Crawford, 251 S.W.2d 76, 77–78 [4] (Mo.1952).

■ Because we are not required to con the argument portion of defendant's brief or the transcript to ascertain the whereins and whys of points that are presented in briefs as mere conclusions [State v. Dennison, 428 S.W.2d 573, 579 [8] (Mo.1968)], our doing so in this instance is a pure gratuity. The gist of defendant's argument is that since neither morphine sulphate nor pethidine hydrochloride are listed as controlled substances in the statutes or included in the list of drugs prepared and filed by the division of health per § 195.230, supra, the information is defective. The error in this argument is that any derivative of opium and salts of pethidine are included in the statutory listings as controlled substances that are unlawful to possess. Consequently, the controlled substances here involved were defined by law and their listing by the division of health was not required. State v. Scarlett, 486 S.W.2d 409, 411 [3] (Mo.1972). Moreover, it was not amiss that the information included the particular kind of opium derivative and

salt of pethidine defendant was charged with possessing to avoid a bill of particulars to disclose the particular substances involved. Rule 24.03.

## II

The second point in defendant's brief is: "The trial court erred in giving instructions numbered 2, 4, 6, 12 and 13, in that, said instructions are contrary to the law of the State of Missouri and are confusing, misleading, and direct the jury to proceed in a manner not in accord with the laws of this state." Defendant's omission to demonstrate in this point any alleged deficiencies in the enumerated instructions or to state wherein and why they misdirect the jury or are contrary to law, misleading and confusing, all as required by Rule 84.-04(d), means that the second point is a nullity insofar as appellate review is required. State v. Nelson, 459 S.W.2d 327, 334 [12] (Mo.1970). In spite of the defect in the point, we briefly note instructions 2 and 4 charged the jury that before defendant could be found "guilty of possession of a controlled substance as charged in Count I [and] Count II of the information," they had to find that defendant "wilfully, unlawfully and feloniously" possessed "a derivative of opium, to-wit: morphine sulphate" and "a salt of pethidine, to-wit: Pethidine hydrochloride." In the argument portion of the brief, defendant's complaint is that instructions 2 and 4 fail to require a finding that defendant "knowingly" possessed these substances and that there was no evidence of defendant's knowledge of the contents of the brown paper sacks. It was not necessary for instructions 2 and 4 to include the words "knowingly" or "intentionally" because, as the jury was charged by Instruction No. 5, "the term 'wilfully' means intentionally and knowingly; not accidentally or unconsciously." The meaning of "wilfully" is well known, and "unlawfully and feloniously" likewise import intentional acts. The instructions were not erroneous for this reason [State v. Norris, 460 S.W.2d 672, 677 [7] (Mo. banc 1970)] and the evidence of defendant's actions in throwing the sacks over the fence under the circumstances in this case, constituted substantial evidence from which the requisite knowledge could be inferred by the jury. State v. Scarlett, supra, 486 S.W.2d at 410–411 [1]. As we understand defendant's additional argument anent the complained of instructions, it is that they erroneously confuse the separate functions of the court and jury. Instruction No. 6 was a recitation of § 195.016, supra, and instructions 12 and 13 were simply suggested forms of verdicts. Contrary to defendant's urgings, we fail to see how any of the instructions delegated the jury to determine if "a derivative of opium, to-wit: morphine sulphate" or "a salt of pethidine, to-wit: Pethidine hydrochloride" were controlled substances under the law (a question of law for the court) when the instructions clearly left it to the jury to determine (as a matter of fact) whether or not the substances defendant was charged with possessing were those enumerated in the instructions. State v. Carter, 475 S.W.2d 85, 90 [5] (Mo.1972).

## III

Count III in defendant's brief is as uninformative as to the whereins and whys of his claims as the others. It is: "Appellant's rights as guaranteed by the Fourteenth Amendment to the United States Constitution and by Article 1, Section 10, of the State of Missouri [sic] [V.A.M.S.] were denied in that, Sections 195.017, 4, (1)(a) . . . (2)(n) . . . amended, are vague and indefinite so as to violate appellant's due process of law." Defendant cites State v. Bridges, 398 S.W. 2d 1 (Mo. banc 1966) and State v. Carter, 475 S.W.2d 85 (Mo.1972). Although these cited cases concern indictments charging unlawful sale of drugs under former § 195.240, now repealed, defendant's reliance thereon is predicated on the standards of legislative interpretation there enounced, i. e., the statute should be worded so that the average man using due care in reading the law will understand whether he is in pos-

session of a proscribed drug. Defendant argues that the "average" man would not know that morphine sulphate and pethidine hydrochloride are controlled substances under the statute. Section 195.017–4(1)(a) makes opium and any salt, compound, derivative, or preparation of opium a controlled substance. Courts will take judicial notice of facts, scientific or otherwise, which are matters of common knowledge [State v. Summers, 489 S.W.2d 225, 228 [4] (Mo.App.1972)], and if courts take judicial notice of a fact, a fortiori that fact is a matter of common knowledge. Courts take judicial notice that morphine is a derivative of opium [State v. Vallie, 82 Mont. 456, 268 P. 493, 494 [3] (1928)], and "[w]hile morphine is not named in the statute as an alkaloid, derivative, or admixture of opium, we do not suppose there is a person of ordinary intelligence or common understanding . . . but has familiar knowledge . . . that it is an alkaloid or derivative of opium." Commonwealth v. Gabhart, 160 Ky. 32, 169 S.W. 514, 515 (1914). Pethidine, including its isomers, esters, ethers, salts and salts of isomers, is a controlled substance specifically named in § 195.017–4(2)(n). When morphine and pethidine are used in the form of a soluble salt as sulphate and hydrochloride they may become known as morphine sulphate or sulphate salt of morphine or pethidine hydrochloride or hydrochloride salt of pethidine, but the combination does not change the chemical structure of the basic drug. Consequently, the average individual upon reading the statute should conclude and be advised that possession of morphine sulphate and pethidine hydrochloride was basically the possession of morphine, a derivative of opium, and pethidine, both controlled substances under the law. State v. McIntosh, 500 S.W.2d 45, 46 [2–4] (Mo. App.1973).

## IV

Again as a mere abstraction, the fourth point in defendant's brief is: "The trial court erred in overruling appellant's motion to suppress, in that the search and seizure of alleged narcotic drugs were illegal and in violation of appellant's rights as guaranteed under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution and by Article 1, Section 10 of the Constitution of the State of Missouri."

We reject this point for several reasons. When the trial court ruled adversely to defendant on his motion to suppress at the pretrial proceeding and the evidence claimed to have been unlawfully seized was thereafter offered in evidence at the trial, it was incumbent upon defendant to object thereto at trial, with a proper statement of the reasons for such objections, if he desired to preserve the issue for appellate review. State v. Simone, 416 S.W.2d 96, 100 [11] (Mo.1967). At trial defendant did not object to the evidence for any of the reasons now urged or stated in his motion to suppress and, therefore, did not save the point for appellate consideration.

While it is established that the protection of the Fourth Amendment extends to the curtilage, at no time in obtaining the paper sacks and their evidentiary contents of which defendant now complains was the dwelling of defendant or the curtilage surrounding it invaded for the purpose of a search. The evidence indicates the sides and back of defendant's premises were completely enclosed by a fence and that the sacks and contents were found outside the rear fence in a vacant lot where defendant had reportedly thrown them. Defendant had no relationship to the vacant lot which would give him "a reasonable expectation that the property would be free from governmental intrusion other than by a proper and lawful search and seizure." In re J.R.M., 487 S.W.2d 502, 505 and 508 [2] (Mo.banc1972). Ergo, we fail to see how defendant has any standing to object to objects taken from the vacant lot. Searches of vacant lots, unclaimed by defendant in any fashion, and open fields without a search warrant

are not constitutionally "unreasonable" even though entrance thereto is gained by trespass. McDowell v. United States, 383 F.2d 599, 603 [1] (8th Cir. 1967). However, in this instance it appears the officers walked outside the fence and thus gained the vacant lot without any trespass on defendant's land. Moreover, the evidence shows the officers went to defendant's house in the performance of their investigative duties regarding the shooting of Danny Bailey, not to search for controlled substances. Having so entered, the officers were licensees, with the license being conferred by law. State v. Gott, 456 S.W. 2d 38, 41–42 [4] (Mo.1970). Therefore, the presence of the officers on defendant's property was lawful and what was seen by them could not in itself be wrong [United States v. Horton, 328 F.2d 132, 135–136 [2, 3] (3rd Cir. 1964)], even though it revealed an offense different from the one they were investigating. State v. Vineyard, 497 S.W.2d 821, 826 [5] (Mo.App. 1973).

■ In addition to the foregoing must be considered the fact that before seeking the sacks in the vacant lot the officers (1) had discovered Bailey shot and lying on defendant's front porch, (2) had been told by defendant that Bailey's self-inflicted wound (so defendant said) had been caused by defendant's gun which defendant had secreted in the back yard, (3) had seen a bullet hole in the house across the street, (4) had been advised by a neighbor that she thought defendant had done the shooting, and (5) had been informed by a reported eyewitness that after the police had undertaken their investigation, defendant was observed throwing a brown paper sack over his back fence into a vacant lot. It is our view the officers, acquainted with this information under all the circumstances, had the right to seek and seize the paper sack and contents without a warrant because defendant's voluntary act of throwing the sacks over the fence must be deemed an abandonment of his interest therein [United States v. Martin, 386 F.2d

213, 215 (3rd Cir. 1967), cert. den., 393 U. S. 862, 89 S.Ct. 142, 21 L.Ed.2d 130 (1968) ; United States v. Minker, 191 F.Supp. 683 (E.D.Pa.1961), aff'd, 312 F.2d 632, 634– 635 [4, 5] (3rd Cir. 1962), cert. den., 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963) ; State v. Harris, 325 S.W.2d 352, 355–356 [2] (Mo.App.1959)], and by the time the police became aware of the existence of the sacks they were threatened with their loss, removal or destruction. State v. Tarantola, 461 S.W.2d 848, 851– 852 [6] (Mo.1971). We feel there was no unlawful search and seizure of the items taken from the vacant lot and that it was not prejudicially erroneous to admit those items into evidence for the reasons advanced by defendant.

## V and VI

■ The penultimate and last points in defendant's brief are combined for consideration because, like all the other points relied on, they preserve nothing for review since neither complies with the specificity required by Rule 84.04(d). State v. Howard, 486 S.W.2d 660, 662 [3] (Mo.App. 1972). Point V is: "The trial court erred in allowing Donald E. Smith to testify as an expert witness." Point VI is: "The trial court erred in overruling appellant's motion for a mistrial in that: A. Prejudicial error was committed in allowing the jury to view State's exhibits 4 through 10 and 28 through 50. B. The trial court erred in overruling appellant's motion for a mistrial in regard to misconduct on the part of the jury." Why the trial court may have erred, if indeed it did, in permitting Smith to testify or in allowing the jury to view the exhibits, and what misconduct on the part of the jury was involved, if any, is left for us to guess. Nevertheless, to insure no manifest miscarriage of justice occurred we have read the more than 250 pages of Mr. Smith's testimony at the trial and that given at the hearing on defendant's motion to suppress; we have perused the many pages of testimony regarding the exhibits, and the

court's oral admonitions and written instructions to the jury regarding alleged jury misconduct. We find no abuse of discretion on the part of the court in permitting Mr. Smith to testify on the identity of controlled substances, a subject of such nature that persons having no specialized training would be incapable of drawing correct conclusions [State v. Stevens, 467 S.W.2d 10, 23 [13] (Mo.1971); State v. Barker, 490 S.W.2d 263, 273–274 [14–16] (Mo.App.1973)], and we find no error on the part of the trial court prejudicial to the defendant concerning the jury's conduct or the display of any exhibits to them.

The judgment is affirmed.

STONE and BILLINGS, JJ., and ROBERT LEE CAMPBELL, Special Judge, concur.

HOGAN, C. J., not sitting.