**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Joseph QUINN, Defendant-Appellant.**

**No. 38799.**

Missouri Court of Appeals,
St. Louis District,
Division Three.

March 14, 1978.

Motion for Rehearing and/or Transfer
Denied May 9, 1978.

Application to Transfer Denied
June 15, 1978.

Robert C. Babione, Public Defender, Linda Murphy, Asst. Public Defender, St. Louis, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Frank Murphy, Asst. Attys. Gen., Jefferson City, George A. Peach, Circuit Atty., Michael Ravetta, Asst. Circuit Atty., St. Louis, for plaintiff-respondent.

## I.

SIMEONE, Chief Judge.

Defendant-appellant, Joseph Quinn a/k/a Joseph Nathan Quinn, was charged in two counts for the offenses of robbery in the first degree by means of a dangerous and deadly weapon and carrying a concealed weapon. The information also alleged a prior conviction. §§ 560.120, 560.135, 564.-610, RSMo. He was tried by a jury on both counts. The jury was unable to reach a verdict on the robbery count, but unanimously found him guilty of carrying a concealed weapon. Under the provisions of the second offender act, appellant was, on December 17, 1976, sentenced to four years in the Department of Corrections. § 556.280, RSMo. He appeals. We affirm.

Appellant does not question the sufficiency of the evidence. He raises two points on this appeal: (1) that it was "plain error" for the trial court to admit a gun into evidence because it was the product of an unlawful search and seizure and (2) that it was "plain error" for the trial court to allow him to represent himself since there was no valid, intelligent waiver of his right to counsel. Rule 27.20(c). We find neither point to be meritorious and affirm.

## II.

The jury could reasonably find the following facts consistent with the verdict.

During the late hours on the evening of September 25, 1975, and at approximately 11:15 p. m., Mr. Louis Banks, a taxicab driver in the City of St. Louis, after delivering a passenger and after having some automobile trouble, stopped at a gasoline station at Glasgow and Cass Avenues to attempt to repair his vehicle. He was having trouble with a "[l]eaking bottom radiator hose" and "[t]he hot light kept showing—coming on and off." While he was there, "the young man there [the defendant], he flagged me and I ignored him because I had car trouble." There was a young woman with the defendant. The defendant came over to Banks and inquired, " 'You for hire?' " Banks indicated he was

for hire and the defendant and the young lady got into the cab. The defendant indicated he wanted to go to an address on Washington Avenue—at first he gave one address and then another. When the cab arrived at "Pendleton and King Drive" and "[j]ust as I got to the church on Pendleton, that's when he put the gun to my head." He said, " 'This is a stick-up.' " Banks turned and "looked down the gun barrel." Banks said, " 'Oh, man! You've got to be kidding!' " Defendant said, " 'Give me that money.' " Banks handed him eight dollars in "[o]ne dollar bills and singles." Much was made of the way Banks "folded" his money, but the court sustained an objection by the "consulting attorney" to the introduction of the money. The defendant and the young lady, Shirley Sullivan, got out of the cab and the defendant "told [Banks] to go ahead before he would blow my brains out."

Banks radioed his dispatcher that he had been robbed. The dispatcher notified the police. Officers Terran Williams and Kenneth Scoggins received a radio call "for a hold-up" and went to Banks. Banks described the individuals who robbed him and "an all-points over the police radio" was flashed. The officers told Banks to "leave my car where it was" and "I left the cab" and went with the officers. The officers and Banks responded to Sarah and Page to meet an officer a couple of blocks away, where they met Officer Timothy Diffley who had the defendant and Miss Sullivan in custody. Banks was asked to " '[c]ome over and see if this is the man who robbed you.' " Banks identified the defendant. Later he saw the defendant again at the Eighth District Police Station. At trial Banks identified the defendant as the man who robbed him.

On that same evening, at about 11:58 p. m., Officer Timothy Diffley was cruising the area of the 1300 block of Sarah. "There had just been a description placed on the air of a subject wanted for armed robbery in the vicinity." He observed a man and a woman fitting the description "seated on the steps in front of 1310 North Sarah." When Officer Diffley first observed the defendant he was sitting "on the steps." The woman was seated next to him. The man had a "brown paper bag in his hand." The officer got out of the cruiser and asked the man to "step over to the cruiser." "When [the defendant] got up, he gave the bag to her and then he started for the cruiser." The officer asked the woman to come over to the cruiser and "when she got up, she placed the bag on the step." When she came to the cruiser, the officer advised them that they fit the general description of the individuals wanted for the robbery and he placed them in the rear of the cruiser. The officer then "went over the the steps and retrieved the bag." [1] The bag was an $18 \times 24$ inch bag, folded in half. When the officer picked it up, he felt a gun in the fold of the bag—"[t]he gun was in a fold of the bag. The bag was folded over and it was in the fold of the bag." There were two live rounds in the gun. He called for the car that put out the description of the robbery suspects; the car came to the scene and then went to the police station. At the station the defendant and Miss Sullivan were arrested. The defendant was advised of his rights and, after indicating he understood them, he made a statement that "it was his gun and he got it from a friend." At the station the officer looked into the brown paper bag and found a half-pint bottle of gin and some personal papers. The officer also searched the defendant and recovered $5.35 from his person.

On November 10, 1975, an information was filed by the circuit attorney charging the defendant with a prior conviction and two counts of robbery first degree with a dangerous and deadly weapon and carrying a concealed weapon. Certain pre-trial motions were made including a motion to sup-

---

1. On the motion to suppress heard prior to trial, Officer Diffley testified that "[a]fter putting him in the cruiser, I went over and retrieved the bag." When asked what was his reason to get the bag, he "presumed it was part of their property." Upon picking up the bag, he recovered a .32 caliber revolver in the "middle fold of the bag."

press the gun. On November 28, 1975, Mr. Neal P. Murphy of the Public Defender's office entered his appearance as the trial attorney and filed motions for discovery and a psychiatric examination. On April 6, 1976, Mr. Joseph Beatty, assistant public defender, entered his appearance and moved for a psychiatric examination and filed a motion to suppress the gun and statements. A psychiatric examination was given and the defendant was found to have no mental disease or defect.

Trial began on November 22, 1976. Prior to trial the motions were taken up and there was a hearing, outside the presence of the jury, concerning the desires of the defendant to represent himself without a lawyer.

The assistant public defender informed the court that "[i]t is my understanding that Mr. Quinn wants to defend himself in this case." The trial judge requested the defendant to come to the bench and asked the defendant, "Mr. Quinn, is it correct that you want to try this case yourself?" The defendant replied, "Well, this is what I request, sir" and "Yes, I request that." The judge then (1) asked defendant how much education he had, (2) asked defendant what he knew about court procedures, (3) informed defendant that Mr. Beatty had tried many cases, (4) asked whether the defendant thought he could "come into this courtroom and defend yourself"[2], (5) informed defendant that he would be bound by the rules of evidence, (6) informed defendant that this is a "highly technical business," and (7) asked defendant, "[h]ow do you think you can compete with [the prosecutor]?" The court also informed the defendant:

". . . If you want to try the case yourself, all right. But one thing I want you to know . . . you are not going to ask a ridiculous question. If there are some questions you want him to ask, tell him you want him to ask those questions and he'll do the best he can to present the point you wanted to present. . . ."

After a discussion concerning law books and Miss Sullivan, the court then addressed the defendant, "Now do you still want to try this case yourself?" The defendant replied, "Yes, Your Honor, I would like to." The court then said, "All right then." The jury was then told that Mr. Quinn would defend himself and that Mr. Beatty would assist him "wherever he needs help."

Prior to trial the motions to suppress were heard and overruled. The trial proceeded. At trial the above evidence was introduced. The defendant cross-examined the state's witnesses, and at various times the public defender participated in the trial and made certain objections and statements.[3]

The defendant testified in his own behalf. But before he did so, he was warned by Mr. Beatty that he did not have to take the stand and had a right to remain silent. If he took the stand his prior convictions "could be brought in." The defendant indicated he wanted to testify and would bring up his prior convictions himself.

The testimony of the defendant conflicted with the state's witnesses. He was questioned by his court-appointed attorney, Mr. Beatty. He testified that on the morning of September 25, 1975, he was in Hayti, Missouri and left there by bus with Miss Sullivan. They arrived in St. Louis "about 10:40 or maybe something like that" or "about 11—about 11:05 or 11:00. Something like that." When they arrived they took a cab and asked the driver to take them to "1306 North Sarah." He had property there—"my clothes [were] there with a friend of mine." They arrived about 11:30

2. The defendant replied, "Well, the questions that I would ask, he won't ask, I know. I know."

3. Mr. Beatty objected to Banks identifying the folded money and made a statement. He cross-examined Banks for several pages. At one point the prosecutor objected to both the defendant and Mr. Beatty asking questions and "this filling in of Mr. Beatty as to points that Mr. Quinn may or may not have missed." Mr. Beatty presented the court with a motion for directed verdict at the close of the state's case. At the conclusion of the case Mr. Beatty also requested an instruction.

p. m. They walked to the house; he couldn't find his key so he went to a friend's home at "1310 North Sarah," knocked on the door but she wasn't home. They waited on the steps. Officer Diffley pulled up in front and called to him to come to the cruiser.

"I gets up. I had the gun in my waistband. I puts the gun on the steps out of my waistband because a police officer was pulling up and I didn't want him to catch me with no gun on me. It's a felony offense . . . and so I walks up to the cruiser."

The officer told him he had been identified. Officer Diffley called Miss Sullivan to the cruiser.

"She had my bag in her hand. She was holding it in her lap on the steps. She gets up and puts the bag on the side of the steps and the gun, it was—the gun was behind me. The gun was not in the bag. The officer said the gun was in the bag. It was behind me on the step. I put it from my waistband between me and the girl on the steps because I saw the cruiser pulling up."

He testified that they were handcuffed and placed in the back seat. When he arrived in St. Louis he had about $345.00 on him—the proceeds that were left of a settlement for a workmen's compensation claim. He contended that the officer took the billfold out of his pocket and took "my money." When asked what happened to the rest of the money other than the $5.00, he replied, "I don't know. That's what I been trying to find out."

Instructions were given and arguments were made. In Mr. Quinn's closing argument he stated that the officer said the gun was concealed underneath the bag. "It's not concealed. The gun was neither concealed on me. I had it showing on my person."

He denied robbing Banks—

". . . I'm here to prove to you all I did not rob Mr. Louis Banks. The police, when they arrested me, I had filed suits—complaints against the police department, [the county supervisor] and the Circuit Attorney, Brendan Ryan and his assistant, his aid. They got those in evidence here and framed me on the robbery charges here. They deliberately paid Mr. Banks—this man to say what he said to frame me."

As to the verdict directing instruction on the concealed weapon (count II), he argued, "As I stated, it was observed. I had it to my side." He explained that Miss Sullivan was involved with others in a robbery in Arkansas and "I arrived in St. Louis with this weapon—with this weapon the individual used in the robbery and—robbed in Arkansas."

The jury retired;·it was not able to reach a verdict on the robbery count, but found the defendant guilty of carrying a concealed weapon. After a motion for new trial, which did not include an assignment concerning his voluntary waiver of counsel, was overruled and allocution granted, the court sentenced the defendant to four years in the Department of Corrections.

### III.

On this appeal appellant makes two points. He contends, first, that "[i]t was plain error for the Court to admit into evidence the pistol . . . because it was seized after a police officer searched a bag while the Appellant was locked in a police cruiser" and that such seizure was "unreasonable" and not within any of the exceptions to the constitutional requirements for a warrant. He contends that the search and seizure of the bag (1) was not incident to an arrest, (2) was not within the exception of "exigent circumstances," (3) was not within the scope of the plain view doctrine and (4) cannot be justified on the grounds that the bag was abandoned property. Secondly, he contends that the court erred in permitting the defendant to represent himself because the waiver of counsel was not valid "where the trial court asked only five questions of the Appellant at a hearing regarding his representation and where the information elicited from Appellant . . . was not probative of whether or not Appellant was making an intelligent waiver."

The respondent justifies the seizure of the gun on the basis that the bag was in effect discarded by appellant and argues that, when articles are "dropped or thrown away by the person arrested, and picked up by the officer, the articles are admissible . . . ." The state argues that because appellant discarded the bag there was in effect no search and seizure and that innocent looking objects may be seized as incriminating evidence under suspicious circumstances. The state also justifies the seizure because the officer "'presumed it was part of their property'" and that he retrieved the bag "for safekeeping" and safeguarding appellant's possessions. An oblique reference in the brief with no citation of authorities also justifies the search of the bag for "inventory purposes."

As to appellant's second point, respondent contends that the court did not err in permitting appellant to defend himself because sufficient information was elicited to show an intelligent waiver and that counsel in effect appeared as co-counsel in the case.

### IV.

Much has been written concerning the Fourth Amendment as applicable to the states.

"The Fourth Amendment as applicable to the States protects the right of the people to be secure in their [privacy] by providing that search warrants shall be obtained upon probable cause supported by oath or affirmation. Despite the clear preference of the law for searches authorized by search warrants and despite the general principle that in order to search and seize, a warrant is to be obtained from a neutral and detached magistrate, there have been carved out a few well-delineated exceptions." *State v. Wiley,* 522 S.W.2d 281, 289 (Mo. banc 1975).

The general principle is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). The exceptions are said to be "jealously and carefully drawn." *Coolidge,* 91 S.Ct. at 2032; *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).[4] The burden is on those seeking the exemption to show the need for it. While the basic purpose of the Fourth Amendment, as applicable to the states, is intended to protect the privacy of the individual from unreasonable searches and seizures, *Matter of Duncan,* 541 S.W.2d 564, 570 (Mo. banc 1976), *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), Powell concurring, 96 S.Ct. at 3100, the amendment does not prohibit all governmental searches and seizures or invasions of privacy but prohibits only unreasonable searches and seizures. *State v. Collett,* 542 S.W.2d 783, 787 (Mo. banc 1976).[5]

Of course, for the amendment to be applicable, there must be a "search" or "seizure." A "search" involves, of necessity, a quest for, a looking for, a seeking out of that which offends against the law and it implies a prying into hidden places for that which is concealed and not that which is open to view. *State v. Reagan,* 328 S.W.2d 26, 28-29 (Mo.1959).

The normal and ordinary limitations to the warrant requirement have recently been discussed. *See State v. Hall,* 508

**4.** *See* the classic statement of Mr. Justice Jackson concerning the policy underlying the Fourth Amendment in *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, quoted in *Coolidge,* 91 S.Ct. at 2029.

**5.** In *Coolidge,* 91 S.Ct. at 2059–2060, Mr. Justice Black said:

"[T]he Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only 'unreasonable searches and seizures.' The relevant test *is not the reasonableness of the opportunity to procure a warrant,* but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts." (emphasis added).

S.W.2d 200, 202–203 (Mo.App.1974); *State v. Funk,* 490 S.W.2d 354 (Mo.App.1973); and *Kansas City v. Butters,* 507 S.W.2d 49, 53 (Mo.App.1974). In *Butters,* 507 S.W.2d at 53, it is stated:

> "A properly issued search warrant does not stand alone as the only means by which the Fourth Amendment requirement of reasonableness can be met. The Fourth Amendment's absolute admonition against unreasonable searches is not violated, (1) by a search incident to a lawful arrest, *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) and *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), (2) by protective searches by officers for weapons upon less than probable cause to arrest, *Terry v. State of Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), (3) by seizure of items falling within the 'plain view' doctrine, *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), nor (4) by the search of a motor vehicle where 'probable cause' exists to believe that it contains a substance which offends against the law, *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 453 (1925) and *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)." [6]

Other exceptions, of course, are recognized—consent, *State v. Rush,* 497 S.W.2d 213, 215–216 (Mo.App.1973); exigent circumstances, *Wiley,* 522 S.W.2d at 293–295; inventory searches, *Opperman,* 96 S.Ct. at 3098, *State v. Achter,* 512 S.W.2d 894, 904 (Mo.App.1974); officer sees a person "drop evidence" and the officer seizes it, *State v. Hall,* 534 S.W.2d 508, 510 (Mo.App.1976), *State v. Boykins,* 434 S.W.2d 484, 486 (Mo. 1968), *State v. Baines,* 394 S.W.2d 312, 315–316 (Mo.1965), *cert. den.* 384 U.S. 992, 86 S.Ct. 1900, 16 L.Ed.2d 1008, *State v. Jefferson,* 391 S.W.2d 885, 888 (Mo.1965); property is abandoned, *State v. Brewer,* 540 S.W.2d 229, 231 (Mo.App.1976), *State v. Tarantola,* 461 S.W.2d 848, 851 (Mo.1971), *State v. Stavricos,* 506 S.W.2d 51, 58 (Mo.

App.1974), and *State v. Jackson,* 476 S.W.2d 540, 542 (Mo.1972).

In ruling upon the Fourth Amendment considerations with reference to search and seizure, the courts view the "totality of the circumstances" and the "concrete factual context." *State v. McGee,* 473 S.W.2d 686, 687 (Mo.1971); *Butters,* 507 S.W.2d at 52; *Hall,* 508 S.W.2d at 202.

The context of the situation here was that a robbery had recently taken place. Banks, the victim, described his assailants. A call was put out over the radio. Within a short time, Officer Diffley saw the appellant and Miss Sullivan. Both persons fit the description. The appellant had a brown paper bag in his hand. When the officer called to the appellant and before he came to the cruiser, he gave the bag to Miss Sullivan. She held the bag. When the officer asked her to "come over" to the cruiser she placed the bag on the step. That is when the officer "went over to the steps and retrieved the bag" because he "presumed it was part of their property." Upon picking up the bag, although the officer could not see the gun, the officer "felt" the gun inside—"it was in a fold of the bag." Under these circumstances we hold there was no constitutional violation.

In viewing the "totality of the circumstances" in this proceeding, we are convinced that the action of Officer Diffley in retrieving the 18″ × 24″ bag on the steps after it had been placed there by Miss Sullivan and finding a gun in the fold of the bag was not violative of the appellant's Fourth Amendment rights.

■ First, we do not believe that there was, in this case, a "search" within the technical meaning of that term. A "search," within the constitutional provision, involves a " 'quest for, a looking for, or a seeking out of, that which offends against the law. It implies a prying into hidden places for that which is concealed.' . ." *Reagan,* 328 S.W.2d at 28, quoting from

---

6. *See also Hall,* 508 S.W.2d at 202 -203; *State v. Holman,* 556 S.W.2d 499, 504–505 (Mo.App. 1977).

*State v. Hawkins,* 362 Mo. 152, 240 S.W.2d 688, 692 (1951). Here the officer did not seek out or specifically look for that which offends against the law. Upon placing the appellant into the police cruiser he "went over to the steps and retrieved the bag"—the property of the appellant. It was then that he "felt" the gun in the bag. He was not searching for any weapon or other material offensive to the law.

■ Second, there was not an unreasonable "seizure"—the ultimate test under the Fourth Amendment—in retrieving the bag and "seizing" the gun. The officer saw two people on the porch, not in a home, with a bag. The officer could reasonably anticipate that it belonged to one or the other or both. The appellant does not question that the officer had probable cause to stop and arrest the appellant. When he placed appellant in the cruiser, he was in effect arrested. A robbery had just occurred; the bag was left on the step; the officer was going to take the two into custody. If the officer did not retrieve the bag on the step, he may well have been subject to criticism or at worst legal action. To wait on the street and "stand over" the bag until a search warrant could be obtained would be impractical.[7] The test is not whether it is reasonable to obtain a warrant but whether the seizure of the bag under these circumstances was reasonable. *See Mulligan v. United States,* 358 F.2d 604, 607 (8th Cir. 1966). The Fourth Amendment does not require that the police blindly ignore evidence which is left under such circumstances. *See Brewer,* 540 S.W.2d at 231. The practical and reasonable action was to retrieve the bag, and, upon taking possession of the bag, the officer was justified in taking the gun found in the fold.[8] The gun contained two live rounds. Since the robbery had recently taken place in which a gun was used, it was reasonable for the officer to anticipate that the bag contained either a weapon or the fruits of the offense. *See Collett.* "Under suspicious circumstances . . . innocent looking objects may be legally seized as incriminating evidence." *Hall,* 534 S.W.2d at 511.

■ Third, we believe that the retrieval of the bag in which the gun was found was a "caretaking" procedure akin to an inventory search. *Opperman,* 96 S.Ct. at 3096. Inventory procedures have been sustained as "reasonable police intrusions."

> " '[W]hen the police take custody of any sort of container [such as] an automobile . . . it is reasonable to search the container to itemize the property to be held by the police. [This reflects] the underlying principle that the fourth amendment proscribes only *unreasonable* searches.' *United States v. Gravitt,* 484 F.2d 375, 378 (CA 5, 1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974) (emphasis in original)." *Opperman,* 96 S.Ct. at 3097–3098.

While *Opperman* dealt with an automobile, the Supreme Court decision broadly dealt with the "caretaking" function. Mr. Justice Powell, in a concurring opinion, stated: "The protection of the owner's property is a significant interest for both the policeman and the citizen." 96 S.Ct. at 3101. *See also State v. Masters,* 530 S.W.2d 28 (Mo.App. 1975), where the defendant's wallet was taken at a hospital which yielded incriminating evidence.

■ Fourth, the retrieval of the bag came within the "plain view" exception to the warrant requirement although the contents of the bag were not readily perceived. "Plain view" alone is not sufficient to justify a warrantless seizure. It is also necessary that (1) the evidence be observed in plain view while the officer is in a place where he has a right to be, (2) the discovery of the evidence is inadvertent and (3) it is apparent to the police that they have evi-

---

7. What would the officer have done if, while watching the bag a stranger came up, claimed the bag was his and wanted to take "his property?" Would the officer be justified in prohibiting the taking?

8. The officer's testimony is somewhat conflicting—at one point he stated that he felt the gun inside and "opened it up" and at another point he stated that the gun was in the "fold of the bag." The distinction is not crucial.

dence before them. *Collett*, 542 S.W.2d at 786; *Coolidge*, 91 S.Ct. at 2037. These requirements are met here. When the bag was left on the steps by Miss Sullivan after the appellant gave it to her, and after the two were placed in the cruiser, it was reasonable for the officer to anticipate that the bag [as the purses in *Collett*] might contain "some incriminating evidence." *Collett*, 542 S.W.2d at 787. The officer could reasonably be justified in believing that the bag [as the purses in *Collett*] contained evidence relating to the offense for which the appellant was arrested. It was thus reasonable for the officer to seize the gun when he felt it in the fold of the bag.

■ Fifth, the circumstances here are analogous to the so-called "dropsy cases." In such cases the objects seized are sometimes innocuous.

In *Jackson*, 476 S.W.2d 540, a police officer sought to help a stalled truck. He saw the defendant drop a Bufferin bottle to the ground and retrieved the bottle which contained narcotics. The court held that where the officer simply retrieved the bottle from the pavement there was no search, and absent a search there could be no seizure.[9]

In *Brewer*, 540 S.W.2d 229, the defendant, upon seeing officers, took an object from his pocket and wrapped it in a T-shirt and placed it in the gutter. The officer examined the object and discovered a pistol. Defendant was convicted of carrying a concealed weapon. This court held that there was no unconstitutional search and upheld the admission of the evidence under the "dropsy cases."

While the bag was not "dropped," "cast aside," "abandoned" or "discarded" in the sense used in the above cases, the bag was given to Miss Sullivan and "left" by her on the steps so that the above decisions are

sufficiently analogous to uphold the admission of the evidence found within the fold of the bag.

■ Sixth, whatever error there may have been in the introduction of the weapon into evidence, we believe that the error, if any, was cured by the judicial admissions made by the defendant in his testimony and in his closing argument. In his direct testimony, the appellant admitted:

". . . I had the gun in my waistband. I puts the gun on the steps out of my waistband because a police officer was pulling up and I didn't want him to catch me with no gun on me. It's a felony offense—you know—and so I walks up to the cruiser."

He argued that, while he had the gun, it was discernable by ordinary observation. "As I stated, it was observed. I had it to my side." Appellant admitted he had a gun in his waistband but argued that it was discernable when he put it down. In *State v. Hogan*, 273 S.W. 1060 (Mo.1925), where the accused admitted he was carrying a gun when arrested, the admission of other revolvers was not prejudicial. *See* cases collected in 9C Mo. Digest, Criminal Law ■

In such circumstances, any error in the admission of the weapon was cured by the appellant's own testimony.

■ Seventh, although this point was raised as "plain error," we find no manifest injustice or miscarriage of justice in the admission of the gun. Rule 27.20(c). While a motion to suppress the gun was filed prior to trial and the motion was heard and overruled, no objection to the admission of the gun was made at trial. It is elementary that, to preserve the issue for appellate review, a motion to suppress items of evidence must be made and an objection must

---

**9.** In *Jefferson*, 391 S.W.2d at 888, it is said: "Where the articles sought to be suppressed were in plain sight of the arresting officer, were dropped or thrown away by the person arrested, and were picked up by the officers, the articles are admissible in evidence over an objection that they were seized as the result of an unlawful search." *Stavricos*, 506 S.W.2d 51—

throwing sack over fence (abandonment); *Tarantola*, 461 S.W.2d 848—throwing items in fire (abandonment); *Baines*, 394 S.W.2d 312—defendant threw an envelope on floor and officer retrieved it—no seizure; *State v. Owens*, 391 S.W.2d 248 (Mo.1965); *Boykins*, 434 S.W.2d 484—dropped package on street; *State v. Hill*, 562 S.W.2d 801 (Mo.App.1978).

also be made at trial. *State v. McLemore,* 541 S.W.2d 723, 724 (Mo.App.1976); *State v. Murphy,* 521 S.W.2d 22, 25 (Mo.App.1975); *Hall,* 534 S.W.2d at 510 and cases cited therein. Rule 27.20(c) permits us in our discretion to consider "[p]lain errors affecting substantial rights" when the court "deems that manifest injustice or miscarriage of justice has resulted therefrom."

We are convinced that the invocation of the plain error rule is inapposite as to this point raised by the appellant even though defendant acted as his own attorney. The retrieval of the bag in which Officer Diffley found the gun in the fold was not such an unreasonable act under the circumstances or constituted such a manifest injustice or miscarriage of justice so as to reverse the conviction.

In this decision we do no violence to *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). There police officers armed with a warrant of arrest but no warrant to search went to the defendant's home and searched the house of the defendant. The Supreme Court held the search invalid, stating:

> ". . . In addition [to searching the person incident to an arrest], it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 89 S.Ct. at 2040.

The Court held that the warrantless search incident to an arrest is limited to the "area 'into which an arrestee might reach'." *See*

also *Cupp v. Murphy,* 412 U.S. 291, 295, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973).

We do not believe that *Chimel* is dispositive of the issue here.

This is not a situation where there was a search and seizure of the bag "incident to an arrest." Officer Diffley did not "search" the area beyond which the appellant might reach; he did not "seek out," or make a "quest for," the gun; he did not "look for" the weapon. He simply retrieved the bag and "felt" a gun and then took it into custody.

*Chimel* has not been applicable to all situations when the "search" took place beyond an area where the person might reach. The thrust of *Chimel* was that the arrest of a person could not justify a routine search beyond the area where he might reach. *Cf. Wiley,* 522 S.W.2d at 289–291.

We hold the appellant's first point to be without merit.

## V.

■ We turn to appellant's second point—that the court erred in permitting defendant to represent himself because the appellant's "waiver" of his right to counsel, guaranteed by the Sixth and Fourteenth Amendments and Article I, section 18(a) of the Missouri Constitution, was invalid since there was not an intelligent waiver of the right to counsel under the circumstances.[10] This point, too, is raised as "plain error;" the point was not raised in the motion for new trial. Appellant argues that the record does not reflect the "painstaking" or "solicitous" or "penetrating" or "comprehensive" inquiry that "the courts have mandated to determine if a waiver is made knowingly and intelligently." Appellant argues that the record reflects that a total of "five" questions were asked and that none of the responses "give an indication of whether or not Appellant was making a knowing and

**10.** Appellant relies upon several cases dealing with the general principles relating to the right to counsel and an intelligent waiver thereof. Among the cases relied upon are *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); and *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

intelligent waiver. . . . The record fails to demonstrate that Appellant's waiver was a knowing and intelligent one and therefore the presumption that it was not, must stand."

In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court of the United States was faced with the issue of "whether a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." *Faretta*, 95 S.Ct. at 2527 (emphasis in original). While not an "easy question" the Court concluded that a state may not constitutionally force a lawyer upon the defendant. The trial court held that Faretta had no constitutional right to conduct his own defense and required that the defense be conducted only through the appointed attorney. The California court affirmed the conviction. The Supreme Court, however, reversed.

In the course of the opinion the Supreme Court stated:

"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forego those relinquished benefits. . . . Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-rep-

resentation, *he should be made aware of the dangers and disadvantages of self-representation,* so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' . . . ." *Faretta*, 95 S.Ct. at 2541 (emphasis added).[11]

Since the record indicated that Faretta was literate, competent and understanding and that he was voluntarily exercising his right, the Court reversed the judgment forcing Faretta to have appointed counsel.[12]

Appellant also relies upon *State v. Tilley*, 548 S.W.2d 199 (Mo.App.1977). In *Tilley*, the defendant was convicted of stealing over $50.00. In his motion for new trial, defendant contended he did not knowingly and intelligently waive his right to counsel and was prejudiced by being required to represent himself. This court held that the record did not indicate that the defendant "understood the dangers and disadvantages of self-representation," as required by the authorities. This court noted that during the trial defendant's lack of knowledge and training became "quite obvious." [13]

In the circumstances here, we conclude that there was no "plain error" in permitting the appellant to represent himself because (1) the appellant's Sixth and Fourteenth Amendment rights were not violated, (2) the defendant knew what he was doing and his choice was made with "eyes wide open," (3) the record shows that he was made aware of the dangers and disadvantages of self-representation as required by *Faretta*, and (4) the appellant was pro-

11. Questioning by the judge revealed that Faretta had once represented himself in a criminal prosecution, that he had a high school education and that he did not want the public defender. The judge responded that he believed Faretta was making a mistake, and emphasized that he would receive no special favors, that he was going to follow the procedures, that he would have to ask the questions right and that he would have to play with the "same ground rules." The judge prior to trial sua sponte held a hearing and questioned him about the hearsay rule and the challenge of potential jurors.

12. The Court emphasized that the trial court warned Faretta that it thought it was a mistake not to accept the assistance of counsel and that he would be required to follow the "ground rules" of trial procedure. The Court made no

assessment of how well or poorly Faretta had mastered the hearsay rule of the challenges to jurors for his "technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." 95 S.Ct. at 2541.

13. In *State v. Gaye*, 532 S.W.2d 783 (Mo.App. 1975), we held that, where the defendant had more than one lawyer and caused several delays in bringing the case to trial, he knowingly and wilfully waived his right to counsel when he was advised against self-representation and warned of the risks, pitfalls, possibilities and serious consequences of his conviction. A lawyer was present in the courtroom in case appellant desired to consult with him.

tected by the presence of counsel who participated in the defense of the case in numerous aspects.

At the beginning of the trial the appellant was asked whether he desired to represent himself; he replied, ". . . this is what I request, sir." The trial court inquired about his education, warned him of the dangers of trying the case himself, informed him that this is a "highly technical business," and inquired of him how he thought he could compete with the experienced prosecutor.[14]

Furthermore, throughout the trial the appellant was given the assistance of appointed counsel. On numerous occasions counsel objected, made motions, interrogated witnesses and offered instructions. In fact, at one point, the prosecutor complained that the appointed counsel was "filling in" as to the points that the appellant may or may not have missed. Here there was more than standby counsel; there was participating counsel. *Cf. Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 506, 27 L.Ed.2d 532 (1971), Chief Justice Burger concurring.

We do not believe that *Tilley* is controlling. In *Tilley,* the trial court merely inquired whether the defendant wished to represent himself and did not make the defendant aware of the dangers and disadvantages of self-representation.

Under these circumstances, we cannot conclude that there was plain error. There was no manifest injustice or a miscarriage of justice. The appellant was interrogated at the beginning of the trial; he indicated a desire to represent himself; he was informed of the intricacies of trying the cause himself. He was made aware of the dangers and disadvantages of self-representation.[15] The public defender in many respects aided him throughout the trial. There was no miscarriage of justice.

Normally, the plain error rule is rarely invoked by appellate courts. *See State v.*

*Shelton,* 544 S.W.2d 599 (Mo.App.1976); *Murphy,* 521 S.W.2d at 25; V.A.M.R., Rule 27.20, Notes 166–177. Since its adoption, Rule 27.20(c) has been invoked on a case to case basis to prevent manifest injustice or miscarriage of justice. In order to invoke the plain error rule, there must be a sound, substantial manifestation, a strong, clear showing that injustice or miscarriage of justice will result if the rule is not invoked. The ordinary rules of judicial procedure cannot be abandoned. To do so would invite chaos. Only by adhering to the established rules will we have an orderly process. *State v. Meiers,* 412 S.W.2d 478, 480–481 (Mo.1967).

We conclude that appellant's second point is also without merit.

## VI.

We have read the entire transcript, the briefs of the parties and all the authorities relied upon therein. We have conducted our own independent research and we are convinced that there was no "plain error" causing manifest injustice or a miscarriage of justice, so the judgment of conviction should be affirmed.

The judgment is affirmed.

GUNN and KELLY, JJ., concur.

## APPENDIX

When a defendant or his counsel in a criminal case informs the court that he desires to represent himself, the trial court should engage in a discussion with the defendant. The discussion between the trial court and the defendant should fall into three general categories:

(1) The defendant should be made aware of the dangers and disadvantages of self-representation. The defendant should be advised (a) that self-representation is almost always unwise and that he may conduct a defense ultimately to his own detriment, (b) that he will receive no special

---

**14.** Compare the colloquy in this case with the colloquy in *Faretta.*

**15.** Since this is one of the first cases to be decided after *Faretta* in this state, we make certain suggestions to the trial courts concern-

ing the procedures to be followed when a defendant in a criminal case informs the court that he desires to represent himself. These suggestions are embodied in the appendix following this opinion.

indulgence by the court and that he must follow the technical rules of substantive law and criminal procedure and evidence, and (c) that the prosecution will be represented by an experienced, professional counsel.

(2) The court should make inquiry into the defendant's intellectual capacity to make an intelligent decision: (a) inquiry should be made of his education and familiarity with legal procedures, (b) if there is any question as to the defendant's mental capacity, an inquiry into that subject should be made, (c) defendant should be made aware that he has a right to counsel at no cost if indigent, (d) the court should explore the nature of the proceedings and establish that defendant knows what he is doing and his choice is made with his eyes open, and (e) defendant should be informed that if there is misbehavior or trial disruption, his right of self-representation will be vacated.

(3) The defendant should be made aware that in spite of his efforts he cannot afterwards claim inadequacy of representation.

These suggestions are based upon *People v. Lopez*, 138 Cal.Rptr. 36, 71 Cal.App.3d 568 (1977).